**UNITED STATES of America,**
**Libellant,**

v.

**ONE CARTON POSITIVE MOTION PICTURE FILM ENTITLED "491" (35 mm. Black & White, 5 Double Reels, 9610 feet, Swedish Soundtrack with English Subtitles),**

**Janus Films, Inc., Claimant.**

United States District Court
S. D. New York.
Nov. 17, 1965.

Robert M. Morgenthau, U. S. Dist. Atty., Southern District of New York, Arthur S. Olick, Asst. U. S. Dist. Atty., Judith Nochimson, Asst. U. S. Dist. Atty., for libellant.

Ephraim London, New York City, (of Brennan, London & Buttenwieser), New York City, for claimant, Janus Films, Inc.

GRAVEN, Senior District Judge (by assignment).

1. In this proceeding the Government seeks the forfeiture of an imported motion picture film on the ground that it constitutes obscene material the import of which is prohibited by Section 305 of the Tariff Act (Sec. 1305, Title 19 U.S. C.A.).

2. Section 305 of the Tariff Act (Sec. 1305, Title 19 U.S.C.A.) lists a number of items the import of which is prohibited. Among those items is "obscene" matter. That Section further provides:

"Upon the appearance of any such * * * matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; * * *. Upon the seizure of such * * * matter the collector shall transmit information thereof to the district attorney * * * who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the * * * matter seized. Upon the adjudication that such * * * matter thus seized is of the character the entry of which is by this section prohibited, it shall be

ordered destroyed and shall be destroyed. * * * "

Under that Section, any party in interest may upon demand have the facts or issues determined by a jury and any party may have an appeal or right of review as in the case of ordinary actions or suits. In the present case no demand for a jury was made. Where the Government seeks to forfeit material the importation of which is alleged to be prohibited by Section 305, it proceeds by way of a libel action, which action is conducted under the Admiralty Rules.

The film which is the subject matter of this action was produced in Sweden by an organization known as Svensk Film Industri. It consisted of five double reels of black and white positive, 35mm. motion picture film totalling 9610 feet. It was sought to be imported in this country by Janus Films, Inc., the Claimant herein, a New York corporation which is engaged in the commercial distribution and licensing of motion picture films throughout the country. The dialogue in the film is in Swedish but there are English subtitles. It is what is known and referred to as a feature film.

3. There are a number of issues in this case. The Government contends that the film in question is obscene and hence is not a permissible import under Section 305 of the Tariff Act. The Claimant contends to the contrary. The Claimant challenges the constitutionality of the procedures provided for and followed in connection with the importation of feature films. It also challenges the constitutionality of the provision of Section 305 prohibiting the importation of "obscene" material.

■ 4. This latter challenge will be first considered. The Claimant contends that the word "obscene" is so vague as to violate due process. In the case of Roth v. United States (1957), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, the United States Supreme Court upheld a state criminal obscenity statute against a similar attack.

■ It is the contention of the Claimant that that holding is not determinative of the question as to the constitutional adequacy of the word "obscene" as used in Section 305 because that Section provides for pre-exhibition restraint rather than post-exhibition sanctions provided by criminal statutes. The proceedings in connection with an imported film under Section 305 do operate as a pre-exhibition restraint. The proceedings are in rem rather than in personam and are civil rather than criminal in nature.

It would not seem that the United States Supreme Court would regard the word "obscene" as constitutionally sufficient in a criminal proceeding, yet constitutionally inadequate in a civil proceeding involving obscene matter. If that Court should hold that that word was constitutionally inadequate in connection with criminal proceedings, a different situation would be present. While some writers are of the view that the decision of that Court in the Roth case has been somewhat eroded, yet up to now it has not been eroded to the extent that it is no longer authority as to the constitutional adequacy of the word "obscene." It is the view and holding of the Court that Section 305 is not constitutionally inadequate because of the use of the word "obscene."

■ 5. The Claimant makes a contention relating to the quantum of proof in a proceeding to condemn material on the ground of its obscenity. In criminal proceedings under obscenity statutes, the guilt of the party or parties charged must, of course, be established beyond a reasonable doubt. Although the present proceeding is civil in character, it is the contention of the Claimant that because of the constitutional principles involved the Government has the burden of establishing beyond a reasonable doubt the obscenity of the film involved.

■ In libel proceedings for the condemnation of property allegedly used for illegal purposes, it is not necessary that the Government establish the allega-

tions of the libel beyond a reasonable doubt; it is sufficient if it establishes those allegations by a preponderance of the evidence. D'Agostino v. United States (9th Cir. 1958), 261 F.2d 154, 157, certiorari denied (1959), 359 U.S. 953, 79 S.Ct. 739, 3 L.Ed.2d 760; United States v. One 1955 Mercury Sedan (4th Cir. 1957), 242 F.2d 429; Utley Wholesale Company v. United States (5th Cir. 1962), 308 F.2d 157. The cases cited did not involve the condemnation of allegedly obscene material. Apparently there are no decisions involving the nature of the proof in civil proceedings for the condemnation of material alleged to be obscene. While the United States Supreme Court has adopted a very strict attitude as to proof of obscenity, it has not as yet indicated that in a libel proceeding for the condemnation of material alleged to be obscene it would require that the obscenity of the material be established beyond a reasonable doubt. Apparently it would require that the obscenity of the material sought to be condemned must be clearly established by a preponderance of the evidence. This Court in the present action will follow that apparent rule.

6. The constitutional challenge of the Claimant to the procedures provided for and followed in connection with the importation of feature films requires consideration of certain of those procedures. It appears that ninety per cent of all feature films imported into the United States come to the Port of New York. The procedures hereinafter referred to are the procedures at that port. A motion picture film being imported is accompanied by the usual entry documents prepared by the importer. Upon the arrival of the film it is placed under Customs seal. It is then sent to the projector room of the Collector in New York City. When the sealed package of film arrives at the projector room it is opened and the contents are checked against the documents to determine whether the estimated duty paid is correct, and it is then screened by a Customs' film reviewer. Film reviewers receive periodic instructions concerning the statutes relating to the importation of obscene matter and the court decisions having to do with the matter of obscenity. Following the screening of the film by the reviewer, the reviewer prepares a report. If the reviewer is of the view that the entry of the film is permissible, it is immediately released to the importer. There is no review of such a release. If the reviewer is of the view that the importation of the film might constitute a violation of Section 305, the film is viewed by an Administrative Aide. If the Administrative Aide is of the view that its importation would not be in violation of Section 305, the film is immediately released to the importer. There is no review of such a release. In the event that the Administrative Aide is of the view that it unquestionably appears that the film is not importable under Section 305, the film is transmitted to the United States District Attorney for the Southern District of New York for the institution of libel proceedings. In the event that the Administrative Aide is of the view that it does not unquestionably appear that the film is not importable under Section 305, it is transmitted to the Assistant Deputy Commissioner of Customs at Washington, D. C. That Assistant Deputy Commissioner views the film. If he is of the view that its importation would not constitute a violation of Section 305, it is released to the importer. There is no review of such a release. If the Assistant Deputy Commissioner is of the view that the film might not be importable under Section 305, it is then transmitted to the Customs Office at the Port of New York and by that Office transmitted to the United States District Attorney for the Southern District of New York for the institution of libel proceedings against it. Where a film is detained because of question as to its importability under Section 305, the importer is immediately notified that the film is being temporarily detained. Upon being so notified the importer has several options. It may consent to the forfeiture of the film; it may export the

film; it may also take no action and let the Government proceed against it. The choice is solely that of the importer. In some cases where a film is being detained because of question as to its importability, the importer sometimes seeks an informal conference with the Assistant Deputy Commissioner of Customs to ascertain what portion or portions of the film have given rise to question of its importability. If following such a conference it would appear that the doubt as to the importability of the film was not well founded, the film is released to the importer. There is no review of such a release.

In some cases an importer before conferring with the Assistant Deputy Commissioner of Customs will secure permission to have access to the film for the purpose of deleting certain portions of it. In other cases the deletions will be made after conferring with the Assistant Deputy Commissioner of Customs. The portions deleted would ordinarily be those portions which the importer has reason to believe might have given rise to the question of importability.

The importer has the right to export the entire film and then make a new importation of the film as deleted. In some instances an informal procedure is followed under which the importer consents to the forfeiture of the deleted portions of the film and the Assistant Deputy Commissioner of Customs will then release the film as deleted.

Where it appears that there is such a serious question as to the importability of a film as to require its transmission to the United States District Attorney for possible court proceedings, a seizure of it is then made for such purpose.

7. It was heretofore noted that the Claimant contends that the procedures provided for and followed in connection with imported feature films are constitutionally inadequate. In that connection the Claimant contends that the procedural provisions contained in Section 305 are on their face constitutionally inadequate. The Claimant further contends that the procedures under Section 305 as carried out in practice in relation to feature films in general manifest their constitutional inadequacy. The Claimant further contends that the procedures followed in the case of the particular film in question were such as to deny it constitutional due process. The constitutional questions raised by the Claimant require consideration of a number of decisions. In the case of Times Film Corp. v. City of Chicago, (1961), 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403, it was held that an ordinance of the City of Chicago providing for pre-exhibition examination of motion picture films was not unconstitutional on its face. The Court did not reach the question as to the validity of the standards set out in the ordinance. In the case of Kingsley Books, Inc. v. Brown (1957), 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, it was held that a New York statute which provided for a limited injunctive remedy against the sale and distribution of obscene written and printed matter was constitutional. The cases referred to were followed by the cases of Freedman v. State of Maryland, (1965), 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, and Marcus v. Search Warrants (1961), 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127. The case of Freedman v. State of Maryland, supra, involved a Maryland statute which prohibited the exhibition of a film without first submitting it to the State Board of Censors. An exhibitor challenged the constitutionality of the statute by refusing to submit a particular film to that Board. The film, if submitted, would have met the statutory standards and would have been licensed for exhibition. The Court held that the statute was constitutionally inadequate. In that case the Court stated (p. 55 U.S., 85 S.Ct. p. 737): "Under the statute, the exhibitor is required to submit the film to the Board for examination, but no time limit is imposed for completion of Board action, § 17." The Court, in referring to the statute, further stated (p. 55 U.S., 85 S.Ct. p. 737):

"Thus there is no statutory provision for judicial participation in the procedure which bars a film, nor

even assurance of prompt judicial review. Risk of delay is built into the Maryland procedure, as is borne out by experience; in the only reported case indicating the length of time required to complete an appeal, the initial judicial determination has taken four months and final vindication of the film on appellate review, six months. * * * "

In the concurring opinion of Justice Douglas in that case the following statement is made (pp. 61–62 U.S., 85 S.Ct. p. 740):

"The Court today holds that a system of movie censorship must contain at least three procedural safeguards if it is not to run afoul of the First Amendment: (1) the censor must have the burden of instituting judicial proceedings; (2) any restraint prior to judicial review can be imposed only briefly in order to preserve the status quo; and (3) a prompt judicial determination of obscenity must be assured. * * * "

In the majority opinion it is stated (p. 59 U.S., 85 S.Ct. p. 739) "the procedure must also assure a prompt final judicial decision * * *."

The case of Marcus v. Search Warrants, supra, involved proceedings under a Missouri statute relating to the seizure and forfeiture of obscene publications. The Court held that the statute lacked proper constitutional safeguards. In that case the Court referred to and discussed the procedures provided by a New York statute relating to such publications which were upheld in the case of Kingsley Books, Inc. v. Brown (1957), 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469. The Court stated (p. 737 of 367 U.S., 81 S.Ct. p. 1719), Marcus v. Search Warrants, supra:

" * * * Finally, a subdivision of the New York statute in Kingsley Books required that a judicial decision on the merits of obscenity be made within two days of trial, which in turn was required to be within one day of the joinder of issue on the request for an injunction. In contrast, the Missouri statutory scheme drawn in question here has no limitation on the time within which decision must be made, only a provision for rapid trial of the issue of obscenity. And in fact over two months elapsed between seizure and decision. * * * "

It appears from the recent case of Trans-Lux Distributing Corp. v. Board of Censors, Md., Sept. 27, 1965, 213 A.2d 235, that following the decision of the United States Supreme Court in Freedman v. State of Maryland, supra, the Maryland statute relating to the censorship of film by the State Board of Censors was amended to provide that any film submitted to that Board must be reviewed within five days; that in the event of disapproval of a film by that Board it was required to make an application to the Circuit Court within three days for a judicial determination as to obscenity; that the Circuit Court was required to hold a hearing within five days and enter its determination within two days after the hearing; and that in the event of an adverse decision the exhibitor might appeal to the Maryland Court of Appeals which "shall advance such case upon its hearing calendar to the earliest practicable date."

At the present time it appears from the decisions of the United States Supreme Court that under proper constitutional safeguards there may be a limited pre-exhibition restraint of motion picture films. It is the contention of the Claimant herein that the procedures provided for and followed in connection with imported feature films do not afford the specified and required constitutional safeguards. Some of the other features related to and connected with the import of feature films will next be referred to. Under the Tariff Act the Customs Service is charged with the duty of examining imports for the purpose of ascertaining their duty status. That Service also has the duty to ascertain, or to cause to be ascertained, the permissibility of such imports under the Tariff Act. In order

to carry out that latter duty in connection with imported feature films, it is manifestly necessary that the Customs Service view such films. Where such films upon viewing give rise to no question as to their importability, they are then cleared through Customs. If, however, it would appear upon viewing that a particular feature film might not be importable under Section 305, the Customs Service refers the film to the United States District Attorney for the purpose of securing a judicial determination of its importability.

The Customs Service does not have censorship power as to imported films nor act as a censor of them. In substance, it brings to the attention of the United States District Attorney for his consideration and action those films the importation of which would constitute a possible violation of Section 305 of the Tariff Act. The action brought by the United States District Attorney following the reference of a particular film to him does not constitute a review of any preceding administrative action or decision. It is an original proceeding in which a judicicial determination is made as to whether the film in question is or is not obscene within the purview of Section 305.

It appears, as heretofore noted, that around ninety per cent of the films imported into the United States come to the Customs Office of the Port of New York. The processing of imported feature films was heretofore described. During the calendar year of 1963 there were received at the Port of New York 4,259 shipments of film totalling 31,641,824 feet for examination under the Tariff Act. A substantial number of the films received at that Port are obviously of such a character as not to require screening. All feature films are screened. During 1963 a total of 2,174 shipments of feature film totalling 7,997,348 feet were screened. During 1964 a total of 3,735 shipments of feature film totalling 8,149,874 feet were screened.

It appears that of all the films imported through all the ports of entry each year around 100 of them give rise to some doubt as to their importability under that portion of Section 305 relating to obscene matter. It further appears that in general as to around 70 of such films the doubt is resolved in favor of the importer and the films released forthwith. The remaining 30 are seized and transmitted to the United States District Attorney for further proceedings. The overwhelming number of films so seized are not feature films. They are generally 8 mm. and 16 mm. films intended for private or semi-private showing which are clearly obscene in character.

It appears that over the years a number of imported films which were cleared through Customs without being transmitted to the United States District Attorney for the purpose of securing a court determination as to their obscenity were later the subjects of obscenity proceedings by municipal and state authorities. It also appears that in all cases where those proceedings were reviewed by the United States Supreme Court the Court was of the view that obscenity was lacking. That situation is indicative of the fact that the Customs Service has been cautious in the matter of transmitting feature films to the United States District Attorney for the institution of judicial proceedings against them.

█ It appears that under the directives and practice of the Customs Service the processing of imported feature films is expedited. It appears that feature films are generally screened within a few business days after having been entered. On some occasions in the past when there has been a large influx of imported feature films there has been some delay, but the screening is generally fairly current. Importers should and do take cognizance of the fact that some delay is inherent in the case of importations subject to the Tariff Act. The fact that the Claimant takes cognizance of that fact is indicated by its practice of not scheduling any showing of an imported film until it has cleared Customs and is in its possession. The Customs Service is charged by Congress with

the responsibility of transmitting to the United States District Attorney such feature films as might give rise to question as to their importability under Section 305. Manifestly, those in the Customs Service having to do with such matters should give careful and adequate consideration to the matter of whether a film is of such a character as to require it to be transmitted to the United States District Attorney. It would be manifestly unfair to both the importers and the Government for those in the Customs Service having to do with such matters to hurriedly and without adequate consideration transmit imported films to the United States District Attorney. It appears that where the doubt as to the importability of a feature film is such as to cause it to be sent to Washington, D. C., for review by the Assistant Deputy Commissioner of Customs it may take from a few days up to three weeks to secure such review. It further appears that in the greater number of cases such review results in the film being released. It is to be noted that an importer of any article by the act of entering it for import thereby voluntarily puts it under restraint by the Customs Service for Customs purposes and that it is not a case of the Government reaching out and putting an article under restraint to start with. Where an importer enters an imported film for importation the Customs Service manifestly has a reasonable time in which to process the import for Tariff Act purposes. It is the view of the Claimant that Section 305 is constitutionally defective in that it does not contain any fixed time limits as to the processing of imported feature films for Tariff Act purposes. There are, of course, many hundreds of thousands of imported articles imported into the United States each year. As to many of those articles there is need of prompt processing by the Customs Service, but so far Congress has not fixed definite time limits for the processing of any particular import or imports. It appears that feature films are, in general, promptly processed for Tariff Act pur-

poses. It also appears that of the total number of feature films imported only a small number are referred to the United States District Attorney. It further appears that, in general, the time taken by the Customs Service to consider the matter of referability is only that which is reasonably necessary.

The Court is of the view and holds that on the record in this case it cannot be said that the fact that Section 305 does not contain any fixed time limits for the processing of feature films for Tariff Act purposes by the Customs Service does not make it constitutionally defective. As heretofore noted, it is the claim of the Claimant that as to the particular film here involved the delays were such as to deny it constitutional due process. That matter, as heretofore noted, will be considered later.

8. It was heretofore noted that one of the constitutional safeguards referred to in the case of Freedman v. State of Maryland, supra, was that the exhibitor of film must not bear the burden of instituting judicial proceedings for the purpose of securing a judicial determination as to whether it is or is not obscene. Section 305 provides that constitutional safeguard. The burden is entirely upon the Government to institute such proceedings.

9. It was heretofore noted that another of the constitutional safeguards referred to by the United States Supreme Court was that prompt judicial determination of obscenity must be assured. While the decisions of the United States Supreme Court relating to that matter dealt with state procedures and state courts, there is no reason for assuming that the United States Supreme Court would have one rule applicable to state procedures and state courts and another rule applicable to federal procedures and federal courts.

When a film is referred to the United States District Attorney under Section 305, the only procedure available for the determination of the question of whether the film is or is not obscene is a libel

action for the forfeiture of the film conducted under the Admiralty Rules. Under those Rules when a libel action is filed process is issued. Rule 1 of the local Admiralty Rules which is typical provides, in part, as follows: "Process *in rem* shall be returnable and called by the clerk at the next general motion day, not less than eight days from its issuance unless otherwise ordered." Rule 2 of those Rules provides that "notice of arrest of property in suits *in rem*, shall be published once at least one week before the date on which the process is returnable * * *." Under Rule 11 of those Rules, unless the Court directs otherwise, "the answer, exceptions or exceptive allegations to the libel or petition * * * shall be filed within three weeks after the return day."

It is clear that, because of the provisions of the Admiralty Rules relating to the issue of process, time for appearance and answer and the pretrial procedures afforded, a libel action for the judicial determination of the alleged obscenity of a feature film could not be tried and determined within some of the time limits fixed under some state statutes. Absent the waiver on the part of the Government and a Claimant of the procedures provided under the Admiralty Rules, it is manifest that a trial and judicial determination as to the issue of obscenity could not be had in most cases in less than from four to six weeks and more probably eight to ten weeks. In the case of Freedman v. State of Maryland, supra, in the majority opinion (p. 55 of 380 U.S., 85 S.Ct. 734), Justice Brennan commented unfavorably as to the fact that in that case the decision on appeal as to the issue of obscenity took six months. In the case of Marcus v. Search Warrants, supra, the United States Supreme Court spoke disapprovingly of the fact that in that case over two months had elapsed between the seizure and the judicial decision.

In a libel action conducted for the purpose of securing a judicial determination as to the issue of obscenity under Section 305, all of the parties are given the right of appeal or review. There are, of course, no provisions fixing the time when either a United States Court of Appeals or the United States Supreme Court must hear and determine an appeal. Such appeal might well require several months. The question whether on its face a libel action under the Admiralty Rules does or does not afford assurance of a prompt judicial hearing and determination of the issue of obscenity under Section 305 is troublesome and difficult. The final answer to that question depends upon what the United States Supreme Court regards as constituting assurance of prompt judicial hearing and determination and review in situations where imports are restrained under the provision of Section 305 here involved. If it should be authoritatively held that a libel action conducted under the Admiralty Rules does not give the necessary assurance of a prompt judicial hearing and determination, then manifestly Congress would have to provide some special procedure or procedures embodying fixed time limits for a judicial hearing and determination, including possibly some provisions in connection with appellate review.

In the case of Freedman v. State of Maryland, supra, Justice Brennan in the majority opinion stated (p. 61 of 380 U.S., 85 S.Ct. p. 740): "We do not mean to lay down rigid time limits or procedures * * *." In the absence of authoritative pronouncements by the United States Supreme Court, this Court is not prepared to hold that on their face the present procedures are lacking in assurance of prompt judicial hearing and determination.

10. It is also the contention of the Claimant that even though the present procedures on their face cannot be said to manifest that they do not provide for a prompt judicial hearing and determination of the issue of obscenity under Section 305, yet in practice they do not afford such a hearing and determination. In that connection the Claimant presented evidence as to the length of time it took to complete Section 305 libel pro-

ceedings in the United States District Courts for the Southern and Eastern Districts of New York. It appears that, in general, there was a considerable interval of time between the institution of such an action and the final decree. It also appears that an overwhelming number of those cases were non-contested cases and the forfeiture was by default. It further appears that during the last thirty years the present action is the only contested action in all of the United States involving the question of the obscenity of a feature film under Section 305. Thus, the records referred to throw little light on how long it would take an importer who wishes to contest the forfeiture of a feature film as obscene under Section 305 to secure a judicial hearing and determination on the question of its alleged obscenity.

11. It was heretofore noted that it was the claim of the Claimant that as to the particular film here involved the time it took before it was referred to the United States District Attorney and the time it took to have the question of its obscenity judicially heard and determined was such as to deny it constitutional due process. That contention requires a consideration of what occurred in connection with the present film.

The motion picture film here involved was entered into the New York Customs Office on October 28, 1964. The film was sent to the Collector's projector room on Friday, October 30, 1964. It was first screened by a film reviewer on Wednesday, November 4, 1964. The reviewer reported that the importation of the film might constitute a violation of Section 305. It was then seen and reviewed by the Administrative Aide on November 5, 1964. On November 9, 1964, the Customs Office notified the importer by letter that the film was being temporarily detained as being in possible violation of Section 305 of the Tariff Act. In that letter the importer was asked to furnish information as to the proposed distribution of the film. The reason for the request for such information was that under a Tariff Act regu-

lation the Secretary of the Treasury is permitted to admit otherwise obscene material of recognized and established literary or scientific merit imported for non-commercial purposes. That regulation was in accord with a provision contained in Section 305.

On November 30, 1964, the importer informed the Customs Office that it intended to distribute the film commercially throughout the United States. The attorney for the importer then asked and was given permission to view the film. On December 16, 1964, it was viewed by representatives of the importer. On January 14, 1965, the importer asked permission to view portions of the film a second time and was given such permission. The film was again viewed by representatives of the importer on January 19, 1965. On or about January 27, 1965, the attorney for the importer informed the Customs Office that the importer wished to delete a scene involving a prostitute being forced to have sexual relations with a dog. On February 5, 1965, the reel containing the portion proposed to be deleted was delivered to the importer. The reel was returned to the Customs Office on February 23, 1965. The deleted portion was not with the reel. It was then ascertained that the deleted portion had been sent back to the producer in Sweden. On March 22, 1965, the deleted portion was returned to the Customs Office and by that Office placed back in the film. On April 16, 1965, the film was seized. On April 20, 1965, the film was transmitted to the United States District Attorney for the institution of libel proceedings. On April 22, 1965, the present action was filed.

 The film here involved was screened by the Customs Service on the third business day following its arrival. It was screened by the Administrative Aide on the fourth business day following its arrival. On the third business day following such screening, the importer was notified of its temporary detention. If the Customs Office had immediately transmitted the film to the

United States District Attorney following the screening of it, manifestly it could not be claimed that there had been any undue delay in connection with such transmittal. Because the Administrative Aide was in doubt as to whether the film should be transmitted to the United States District Attorney, that Aide caused the film to be viewed by the Assistant Deputy Commissioner of Customs. Thereafter, there was a delay caused by the desire of the importer to make viewings of the film. Thereafter, there was a long delay caused by the importer allowing a portion of the film to be sent back to Sweden. That portion was finally received back from Sweden on March 22, 1965. Following that there was correspondence between the Administrative Aide at New York and the Assistant Deputy Commissioner of Customs at Washington, D. C. Growing out of the correspondence, arrangements were made for an Assistant United States District Attorney to view the film prior to its being seized and transmitted for court action. The film was viewed by an Assistant United States District Attorney on April 8, 1965, following which, as heretofore noted, the film was seized on April 16, 1965, and on April 20, 1965, it was transmitted to the United States District Attorney. While as to this particular film there was a considerable lapse of time between its arrival at the port of entry and its transmittal to the United States District Attorney, the delay was largely occasioned by the importer. It is the view and the holding of the Court that under the record in this case the Claimant was not denied constitutional due process because of the lapse of time occurring between its entry into Customs and its transmittal to the United States District Attorney.

12. It is also the contention of the Claimant that the length of time it has taken to secure a judicial hearing and determination following the transmittal of the film in question to the United States District Attorney was such as to deny it a prompt judicial hearing and determination of the alleged obscenity of the film under Section 305.

The present action was filed on April 22, 1965. On May 11, 1965, the Claimant appeared and filed a claim for the film for the purpose of contesting its forfeiture. On June 7, 1965, the Claimant filed a motion for summary judgment. On July 21, 1965, that motion was heard by Judge Edward C. McLean. In connection with the hearing on the motion the parties filed briefs and a number of affidavits. The motion presented serious and troublesome questions. In connection with the hearing the film was viewed by Judge McLean. On August 5, 1965, Judge McLean filed an opinion in which he overruled the motion. On August 9, 1965, the Government filed herein a motion asking that the case be assigned to a Judge for all purposes under Rule 2 of the General Rules of the United States District Court for the Southern District of New York, or in the alternative granting a preference under Rule 10 of those Rules. The case was assigned to the present Judge on September 16, 1965, and assigned for trial as the first case to be tried on such assignment. Following a conference with the attorneys, the case was set for trial commencing September 29, 1965, and the trial commenced on that date. After several days of trial the trial was adjourned for ten days in order for the Claimant to secure the attendance of an additional witness.

Under the applicable rules the Claimant had a right to file a motion for summary judgment and it is not subject to criticism for having done so. However, it is apparent that the trial of the case on its merits was delayed by the filing of that motion and the time it took to have it heard and determined. It would appear that, except for the filing of that motion, the case might have been heard and determined on its merits about the time that motion was heard. It was heretofore noted that it was probable that, in general, the judicial hearing and determination of the issue of obscenity under Section 305 would not be had

short of eight to ten weeks. In the present case, absent the motion for summary judgment, the case would probably have been heard and determined on its merits about the time the motion for summary judgment was heard. Thus, the present situation would seem to present the same question heretofore discussed and that is whether a libel action conducted under Admiralty Rules would be regarded by the United States Supreme Court as meeting its views in regard to the prompt judicial hearing and determination as to obscenity under Section 305. In the absence of authoritative pronouncements of the United States Supreme Court, this Court is not prepared to hold that the Claimant was denied a prompt judicial hearing and determination of the question of whether its film was or was not obscene under Section 305.

13. There are several matters which are related to some of the issues in this case to which reference will now be made.

In the cases of United States v. One Book, Entitled "Contraception" (D.C. S.D.N.Y.1931), 51 F.2d 525, and United States v. One Obscene Book Entitled "Married Love" (D.C.S.D.N.Y.1931), 48 F.2d 821, there were involved imports of books which the Government alleged were obscene and hence not importable under Section 305. It was held that the provision of Section 305 which prohibited the import of "obscene" material was not unconstitutional upon the asserted ground that it interfered with the freedom of the press. In the case of Upham v. Dill (D.C.S.D.N.Y.1961), 195 F.Supp. 5, an importer sought to enjoin the retention of a book which the Government alleged was obscene and hence not importable under Section 305 and as to which the libel proceedings were then pending. The Court denied the injunction. It held that the libel action provided an entirely adequate remedy for the determination of the question of the alleged obscenity of the book. That decision was rendered prior to the decisions of the United States Supreme

Court in the cases of Freedman v. State of Maryland, supra, and Marcus v. Search Warrants, supra.

In the case of United States v. 18 Packages of Magazines (D.C.N.D.Calif. 1964), 238 F.Supp. 846, there were involved magazines which had been seized by the Customs Service as not importable under Section 305 and against which the Government was proceeding by libel proceedings. The Court held that the seizure of the books prior to the determination of their obscenity was not constitutionally permissible. That decision was rendered prior to the decisions of the United States Supreme Court under which limited pre-distribution or pre-exhibition restraint apparently is permitted with proper constitutional safeguards.

In the case of the United States v. Ginzburg (3d Cir. 1964), 338 F.2d 12, the Court affirmed convictions of the defendants for the mailing of obscene publications in violation of Section 1461, Title 18 U.S.C.A. The United States Supreme Court has granted certiorari in that case (1965), 380 U.S. 961, 85 S.Ct. 1103, 14 L.Ed.2d 152. The United States Supreme Court has noted probable jurisdiction in a state criminal obscenity case. Mishkin v. New York (1965), 380 U.S. 960, 85 S.Ct. 1103, 14 L.Ed.2d 152. In that case the defendants were convicted of violating the provisions of a New York statute relating to the publication and distribution of obscene books. People v. Mishkin (1960), 26 Misc.2d 152, 207 N.Y.S.2d 390; (1962) 17 A.D.2d 243, 234 N.Y.S.2d 342; (1964) 15 N.Y. 2d 671, 255 N.Y.S.2d 881, 204 N.E.2d 209; (1965) 15 N.Y.2d 724, 256 N.Y.S. 2d 936, 205 N.E.2d 201. The convictions were affirmed by the New York Court of Appeals. On November 8, 1965, 86 S.Ct. 232, the United States Supreme Court agreed to review the case Attorney General v. A Book Named "John Cleland's Memoirs of a Woman of Pleasure" (1965), Mass., 206 N.E.2d 403, relating to the alleged obscenity of the book named in the title of the case. While the decisions in those three cases would not

bear directly upon the question as to the constitutionality of the procedures provided for and followed in connection with the importation of feature films, yet they could bear very directly upon the issue in this case as to obscenity. That issue will be considered later.

It further appears that there are several petitions pending requesting the United States Supreme Court to review cases involving obscenity which have not as yet been acted upon.

 It is well settled that the determination of the question of obscenity is not to be made upon the personal views of the judge or the members of a jury to whom a case involving that issue is being tried. Smith v. People of State of California (1959), 361 U.S. 147, 165, 80 S.Ct. 215, 4 L.Ed.2d 205. Accord, United States v. Klaw, infra.

 The recent decision by the United States Court of Appeals for this Circuit in the case of United States v. Klaw (1965), 350 F.2d 155, deals with many questions in the field of obscenity. In that case the two defendants, upon trial by jury, were convicted of mailing obscene booklets in violation of Section 1461, Title 18 U.S.C.A. The only evidence offered as to the obscenity of the booklets were the booklets themselves. On appeal the convictions were reversed. The Court held that the booklets themselves were insufficient to establish their prurient interest and that testimony of witnesses should have been presented on that matter. Doubtless, because of the holding in that case the parties in the present case presented many witnesses as to prurient interest and as to the character and nature of the film involved. While the case of United States v. Klaw, supra, was a criminal case which was tried to a jury and the present case is a civil case tried to the Court, it would appear that the same rule would be applicable.

 There is one thing which was the matter of some confusion. It was heretofore noted that while the matter of referring the film to the United States District Attorney was under consideration by the Customs Service the Claimant excised that portion of the film portraying a prostitute being forced to have sexual relations with a dog. After some delay in returning the excised portion, it was reinserted in the film by the Customs Office. In connection with the proceedings relating to summary judgment, the Claimant by motion moved the Court not to consider the portion in question as a part of the film and not to view it. At the hearing on the motion for summary judgment the proctor for the Claimant stated of record the willingness of the Claimant to have that portion forfeited and condemned. Preceding the present trial the Claimant again moved the Court not to consider that portion or view it. However, during the present trial the proctor for the Claimant stated of record that the Claimant was not consenting to the forfeiture and condemnation of the portion in question and that the film was to be considered as containing that portion. It was so considered by the witnesses for both parties. The portion in question was a part of the film viewed by the witnesses and the Court, the film, of course, was and is to be considered as a whole. It was so considered by the witnesses. It is so considered by this Court.

14. The question is whether the Government has clearly established by a preponderance of the evidence that the film in question in obscene under what appears for the present to be the tests adopted by the United States Supreme Court. In the case of United States v. Klaw, supra, the United States Court of Appeals for this Circuit was of the view (350 F.2d p. 168) that in the area of obscenity the members of the judiciary are lost in a wilderness. Trial courts having to try cases involving the question of obscenity do in most instances have the feeling of attempting to find their way through a fog in which guides and landmarks appear only dimly and obscurely from time to time. In cases involving obscenity there are many words and terms which, like globules of quicksilver,

elude any firm grasp of them. Among such words are "prurient interest," "hard core pornography," "patent offensiveness," "average person," "contemporary community standards," "dominant theme," and "social importance."

Many of the problems and unanswered questions in the field are discussed in the case of United States v. Klaw, supra. In the opinion in that case the pertinent decisions of the United States Supreme Court are noted. Among the outstanding writers and the most cited writers in this field are William B. Lockhart, presently Dean of the College of Law of the University of Minnesota, and Robert C. McClure, Professor of Law of the same school. The most cited of their writings are the following articles: "Literature, The Law of Obscenity, and the Constitution," 38 Minnesota Law Review 295 (1954), and "Censorship of Obscenity: The Developing Constitutional Standards," 45 Minnesota Law Review 5 (1960). Those articles well set forth the problems and unanswered questions in the field of obscenity. It was heretofore noted that review by the United States Supreme Court is now pending in the three cases referred to. It might well be that by the time the present case would reach the appellate level the tests and rules attempted to be applied by this Court will no longer be applicable. Some writers are of the view that in the review of those cases the United States Supreme Court may adopt new tests and standards as to obscenity. Some writers are of the view that the United States Supreme Court may in its review either drastically limit the scope of obscenity statutes or, in substance, nullify them. The cases to be reviewed have not as yet been argued. The parties to the present action are desirous of a prompt decision. Under the circumstances, this Court will apply the tests and standards which the United States Court of Appeals for this Circuit regards as the tests of the United States Supreme Court.

In the recent case of United States v. Klaw, supra, the United States Court of Appeals for this Circuit stated in regard to those tests as follows (350 F.2d pp. 164–165):

"However, in considering the permissible meaning of 'obscene' in section 1461, we must begin with the Supreme Court's treatment of that statute in Roth. That case contains the oft-quoted—although difficult to apply—statement that material is 'obscene' if: 'to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' * * *.

"In addition to its appeal to 'prurient interest,' proscribable 'obscenity' must be 'utterly without redeeming social importance.' * * * It must go 'substantially beyond the customary limits of candor in description or representation.' * * * It must be characterized by 'patent offensiveness.' * * *."

■ In the quotation just set out, the term "contemporary community standards" is used. In some of the cases and in some of the writings relating to obscenity there is discussed the question as to whether national or local standards are applicable. The seizure in the present case was made under a federal statute of nation-wide applicability. The film in question was intended for commercial distribution throughout the entire country. The parties to the present action proceeded upon the theory that national standards were applicable. This Court adopts that theory. The questions addressed to the witnesses testifying as to the matter of obscenity embodied that theory. Those questions also embodied the other tests referred to in the quotation above set out.

15. The evidence in the case relating to the film in question will next be considered.

The film in question was produced in Sweden by a large organization known as the Svensk Film Industri. The actors were all Swedish. The director was Vilgöt Sjöman. It was the first feature

film directed by him. It appears that he was a protege of Ingmar Bergman, a director with an international reputation. The film came to the attention of the Claimant at the annual Film Festival at Cannes, France. It appears that the film has been exhibited in Sweden and Germany. It is further indicated that its exhibition in Sweden gave rise to controversy. It is indicated that the film exhibited in Germany may have been censored.

The film has to do with several youthful delinquents who had been in difficulty with the law. Krister, a bachelor, had a very good and well-furnished home and made it available for a social agency to make use of for the housing of the boys under the supervision of that agency. Not long after the boys move into the house a clergyman calls with a tape recorder. On the tape recorder he played a recording based upon the Gospel according to St. Matthew (18:21–22):

> "Then came Peter to him, and said, Lord, how oft shall my brother sin against me, and I forgive him? till seven times?
>
> "Jesus saith unto him, I say not unto thee, Until seven times: but, Until seventy times seven."

The boys manifested boredom and disinterestedness during the playing of the recording. The theme suggested by the recording was that while 490 sins could be forgiven the 491st sin would constitute an unforgivable sin. The title of the film, "491," refers to that sin.

The boys indulge in acts of sadism. One boy cuts a piece out of his hand. Another boy holds his hand over the fire in a fireplace until it is charred.

The social worker who had supervision of the boys was referred to as the Inspector. It developed that the Inspector was a homosexual. He had one of the boys come to his private office. He then engaged in what a witness described as homosexual love-making which consisted of stroking and fondling of the boy. The Inspector is shown with his head between the thighs of the boy. The movie stops just short of showing the culmination of the homosexual act, but all of the witnesses who testified as to that happening testified that the matter of the culmination of the homosexual act was not left merely as a matter of speculation.

The boys proceeded to steal and pawn furniture and books belonging to Krister. Supplied with money from doing so, they proceeded to a pier where a freight ship was docked. The crew had a drinking party and sex orgy under way. The boys purchased a large supply of liquor from a member of the crew and joined the affair. A naked prostitute is the subject of the sex orgy. She is shown leaning over the rail in a naked condition while a member of the crew commits sodomy with her. Later she gets dressed and leaves with the boys. In the meantime Krister has discovered the theft of his property which had been pawned. He insisted that the property had to be redeemed. With his acquiescence the boys proceeded to solicit and secure sufficient customers for the prostitute to raise the amount required. Thereafter the boys and the prostitute return to Krister's house where they engage in a sex orgy with her in connection with which there is much exposure of her person and obscene talk. The boys then got angry with her and vented their anger by holding her and forcing a large dog they had picked up into position to have sexual relations with her. The movie stops just short of showing the culmination of sexual relations, but all of the witnesses who testified as to that happening testified that the culmination of the sexual relations was not left as a matter of mere speculation. Thereafter the prostitute passed out of the picture.

There is next portrayed the boys and Krister together. One of the boys has gone out and called in the police. The police informed Krister that the boy had made grave charges against him. The movie ends with the boy who had informed committing suicide by jumping out of a window to the street a considerable distance below.

16. Each side called a number of witnesses. Each side presented movie critics. Each side presented witnesses with a broad background as to social conditions. Each side presented a clergyman with a broad background as to movies and other social problems. The Government presented a physician with a wide and long experience in the field of psychiatry and neurology. The Government also produced the testimony of the Administrative Aide and the Assistant Deputy Commissioner of Customs who have viewed nearly all, if not all, the feature films imported into this country in recent years.

The total number of films viewed by all of the witnesses in recent years ran into the thousands. Around one hundred different feature films were testified to by the witnesses as a matter of comparison in the matter of customary candor, prurient interest, patent offensiveness, and contemporary national standards.

■ 17. One of the witnesses called in behalf of the Claimant testified that there is an organization known as the Motion Picture Association of America of which many but not all the major movie producers belong. He further testified that that Association had a code with which the members agreed to comply in the matter of decency. The witness testified that the film in question would not be in compliance with that code. The fact that a film might or might not be in compliance with that code would not, of course, be determinative as to whether it was or was not obscene within the purview of Section 305 or any other obscenity statute. However, the fact that the film in question would not be in compliance with that code would tend to indicate that it probably goes further in the matter of explicitness and candor than do many films produced in this country.

18. A substantial amount of the testimony related to the matter of the dominant theme of the film. The witnesses presented by the Government testified in substance that the movie was dominated by degeneracy, debauchery, sadism, brutality, homosexuality, and sexual bestiality. The witnesses presented by the Claimant had a variety of views as to the dominant theme. One of those witnesses was of the view that it was a criticism of the so-called welfare state maintained by the country of Sweden. Other witnesses presented by the Claimant thought it constituted a criticism of social welfare methods and welfare workers. Other testimony presented in behalf of the Claimant was to the effect that the film was of theological or religious significance. Other testimony presented in behalf of the Claimant was to the effect that it taught a moral lesson. Other testimony presented by the Claimant was to the effect that it portrayed the triumph of evil. Those witnesses who thought the film was of theological or religious significance called attention to a number of matters in connection with the film. Some thought the name Krister connected that individual with Christ. However, all of the witnesses who testified as to that matter conceded that Krister was not a very Christ-like character. They were pretty well agreed that he was a well-intentioned man but who was so lacking in character as to acquiesce in the prostitution engaged in to redeem his property. In at least three places in the film are shown signs on street pillars asking for help for the lepers. Some of the witnesses presented in behalf of the Claimant thought this had reference to Christ and the lepers. Some of the witnesses presented by the Claimant testified that the film had to do with the 491st, or unforgivable, sin as to which reference was made in the title of the film. One of those witnesses thought that the act of the boys in forcing the prostitute to have sexual relations with the dog was such sin. Some of the witnesses presented in behalf of the Claimant thought that the theological or religious connotations tended to be symbolical in character. Witnesses presented in behalf of the Government were of the view that the claimed religious or moral features were "very psuedo" in

character and merely served as a thin facade to the portrayal of degeneracy, debauchery, sadism, homosexuality, brutality and sexual bestiality.

19. The witnesses seemed to be in agreement that the film, if admitted, would be subject to exploitation by the so-called "grind" movie houses. It appears that by "grind" movie houses is meant those movie houses which attract patronage by lurid advertisements as to the purported lasciviousness of certain scenes in a movie. However, it seems clear that what "grind" movie houses might do to exploit some of the scenes in the film is not determinative of the question whether considered as a whole it does or does not meet the tests recognized by the United States Supreme Court.

20. The question of the recognition of the dominant theme is connected with the question as to who is to make the recognition. That matter is also related to the question of prurient interest. The matter of prurient interest brings up the question of relevant audience. In the Roth case the United States Supreme Court sustained a jury charge in which the jury was charged that the test of obscenity was the effect of the material considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In the present case the witnesses were pretty well agreed that the movie in question was a so-called "adult" movie and should not be viewed by adolescents. However, they recognized that in the United States there is in general no statutory provisions for segregation of movie audiences by ages. The witnesses were also pretty well agreed that for a movie house to put up a sign specifying that the film is for adults only would only allure and attract adolescents to view the movie. A physician presented in behalf of the Government who had a wide experience in the field of psychiatry, especially as related to pornographic or erotic matters, in addition to testifying that the film in question would appeal to the prurient interest of the average person, further testified that in the case of adolescents the viewing of the film by them would especially excite and stimulate them in the matter of erotic sex behavior. He also further testified that the homosexual activities portrayed in the film would act as a special stimulus to latent and active homosexuals. The Claimant, as heretofore noted, is desirous that the film not be viewed by adolescents. However, it makes another contention that is of significance. It is the contention of the Claimant that the effect of a film on adolescents or sexual deviates is not the test in the matter of prurient appeal but it is its impact on an appeal to "the average person." It appears that those contentions find support in the decisions of the United States Supreme Court. Therefore, the effect of the present film upon adolescents would appear to be non sequitur and the same would be true as to sex deviates. It would seem, therefore, that it is the prurient appeal to the average person which is of determinative significance. Numerous witnesses testified as to that matter.

Numerous witnesses testified as to the matter of the social importance or worth of the film. In connection with the matter of social importance or worth, there would seem to be involved the question of social importance or worth to whom? Any material, however obscene, might be of social importance or worth to a person or institution making a study of pornography. However, it would seem that such importance or worth would hardly be determinative. It would seem that on the question of social importance or worth the relevant audience should be given consideration. In that connection consideration should be given to the matter of whether it would be of recognizable social importance or worth to that audience. Witnesses presented in behalf of the Claimant were of the view that the film did have social importance or worth but were in disagreement as to what that social importance or worth consisted of. The witnesses presented in behalf of the Government were of the view that all the film brings out is that it is not desirable to place a social worker

468

who is a homosexual in charge of delinquent boys and that such boys are capable of sadism, homosexuality, brutality, sexual bestiality and other degrading conduct. Those witnesses were of the view that behind a thin facade of tenuous religious and moral teachings the producer undertook to portray with extreme candor and explicitness nearly the whole field of abnormal sex relations.

The evidence clearly preponderates that the film is lacking in social importance or worth.

21. In connection with the matter as to whether the film in question exceeded the customary limits of candor and explicitness, the witnesses compared the present film with around one hundred other films. Witnesses presented in behalf of the Government testified that as to candor and explicitness in the matter of abnormal sex relations the present film went beyond any of the other films. Among the witnesses so testifying were the Assistant Deputy Commissioner of Customs and the Administrative Aide for the Port of New York. The Assistant Deputy Commissioner, who during the past thirty years has viewed all imported films as to which a question was raised, testified that the present film went beyond any of those in the matter of candor and explicitness. The Administrative Aide, who for several years has viewed all films imported through the Port of New York as to which a question was raised, testified to the same effect. Witnesses presented in behalf of the Claimant testified as to certain films which contained scenes which they regarded as comparable in candor and explicitness with the present film. None of those films contained all of the following portrayals: (1) sodomy with a naked woman, (2) homosexual love-making stopping just short of culmination, and (3) sexual relations about to be consummated between a dog and a woman.

The evidence clearly preponderates that the present film in the matter of abnormal sex relations exceeds customary candor and explicitness.

22. The film portrays acts of sadism and brutality. The Claimant contends, and correctly so, that acts of sadism and brutality do not in themselves constitute obscenity.

The film portrays much nudity. The Claimant contends, and correctly so, that under the recent decisions of the United States Supreme Court nudity in itself does not constitute obscenity.

23. There is another feature that should be noted. It was heretofore noted that the film contained a number of English subtitles, some of which were obscene in character. The producer had supplied the Claimant with an English translation of all the Swedish dialogue which accompanies the film. That dialogue was produced by the Claimant during the trial at the request of the Government. In that dialogue the boys spew forth obscenities which make the present English subtitles seem mild in comparison. A representative of the Claimant testified that it was the intention of the importer to dub in the dialogue in English to be used in connection with the exhibition of the film.

It was not indicated that any of the witnesses testifying at the trial had read the dialogue. Therefore, it is not known what weight or significance those witnesses would attach to that dialogue in connection with their views as to the nature or themes of the film. However, it would seem that the dialogue might lend some support for the views of the witnesses presented by the Government as to the nature and character of the film.

24. The evidence presented by the Government clearly establishes as to the film "491" the following:

(a) To the average person applying contemporary community (national) standards, its dominant theme as a whole appeals to the prurient interest.

(b) It is characterized by patent offensiveness.

(c) It goes substantially beyond the customary limits of candor in description and representation.

(d) It is utterly without redeeming social importance.

The foregoing constitutes the Court's Findings of Fact herein.

## CONCLUSIONS OF LAW

1. That this Court has jurisdiction of the subject matter of this libel and the parties thereto.

2. That the film "491" is an obscene matter within the purview of Section 305 of the Tariff Act.

## ORDER FOR DECREE

It is hereby ordered that a Decree shall be entered herein forfeiting and condemning film "491" as provided in Section 305 of the Tariff Act.

It is further ordered that the foregoing Memorandum shall constitute the Findings of Fact, Conclusions of Law, and Order for Decree in this case.