## UNITED STATES v. BELVILLE.
### No. 7758.

United States District Court
S. D. West Virginia, Huntington Division.
March 8, 1949.

Leslie E. Given, U. S. Atty., of Charleston, W. Va., and Philip A. Baer and Milton J. Ferguson, Asst. U. S. Attys., both of Huntington, W. Va., for plaintiff.

O. E. Irish, of Ironton, Ohio, and H. L. Ducker, of Huntington, W. Va., for defendant.

WATKINS, District Judge.

Although no request has been made for special findings of fact, I make the following general and special findings pursuant to Rule 23(c), Rules of Criminal Procedure, 18 U.S.C.A.:

I find the defendant, Lindsey Belville, guilty as charged in Counts 1, 2, 3, 4, 5, 6, 7, 9, 11, 12, 13, 14, 15, 16, 17, 18 and 20 of the within Indictment No. 7758.

I find the defendant, Lindsey Belville, not guilty as charged in Counts 8, 10 and 19 of the within Indictment No. 7758.

### Special Findings of Fact.

1. For the years 1945-1946, the defendant was a tobacco dealer within the meaning of the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1281 et seq., operating on the Huntington, West Virginia, market at the Huntington Warehouse, within the jurisdiction of this court.

2. That such act was in full force and effect in the Huntington or Tri-State area during the tobacco crop year of 1945-1946.

3. The farmers in such tobacco area voted into effect the quota provisions of such act, by an election held by the Department of Agriculture, at which 96% of the farmers voting in such tobacco area voted in favor of such quotas.

4. Quotas of tobacco which each farmer could raise without penalty were thereafter established in accordance with the provisions of such act by the Department of Agriculture. These quotas were based on the number of acres that would be necessary to produce the amount of tobacco which the Department of Agriculture figured would be consumed the following year

so that there would be no overproduction to lower the price which the farmer would receive for his product.

5. Farmers who raised more than their quota in that area in 1945 were required to pay a penalty to the United States (in the nature of a tax) of ten cents per pound on all non-quota tobacco raised and sold by them. Until such tax was paid the farmer or tobacco dealer could not receive payment for such tobacco when sold on the floor of the Huntington Warehouse. A farmer or dealer who sells quota tobacco at the warehouse is not required to pay any penalty.

6. In order to distinguish quota tobacco from non-quota tobacco, each farmer with a tobacco quota is given a quota marketing (white) card or book. Farmers raising non-quota tobacco receive pink non-quota cards. When such farmer sells his quota tobacco to a dealer, he or the dealer tears out a memorandum sale slip from the white quota card, which is filled in to show the amount of tobacco sold, the price, and is signed by the farmer and dealer. Before the dealer can re-sell this quota tobacco at the warehouse and be paid for it he must present such white memorandum sales slip to the representative of the Department of Agriculture at the warehouse. He must also fill out and sign a dealer's report showing all purchases made by him from farmers with the amount of quota or non-quota tobacco purchased from each during such crop year. These records are filed with the Department of Agriculture as permanent government records to show the tobacco production of the farms in question, and showing the amount of non-quota tobacco raised upon which a penalty is collected. This procedure is provided for in such act, and particularly in Section 1314 and Section 1373 and in Section 725.-148 of Chapter 7 of the Regulations issued by the Secretary of Agriculture on May 13, 1945 covering the 1945 tobacco crop.

7. In order to avoid payment of the penalty on non-quota tobacco purchased by him, the defendant caused the amount of tobacco shown on the white quota memorandum sales slips to be increased, altered and forged. Therafter he sold non-quota tobacco purchased from one farmer upon the quota card of another farmer, thereby avoiding payment of any penalty. These white quota marketing cards or sales memoranda, so altered and forged, and containing a false statement as to the amount of penalty-free tobacco purchased from the various farmers mentioned in the indictment, were thereafter filed or caused to be filed by the defendant with the field representative authorized to accept delivery of such cards for and on behalf of the Department of Agriculture, the defendant then and there knowing that said bills of non-warehouse sales were false.

8. In a matter within the jurisdiction of the Department of Agriculture, the defendant did knowingly, wilfully, and fraudulently make and use and cause to be made and used a false bill of non-warehouse sale, the execution of which is prescribed and required by Section 725.138 (7 F.R. 6361) of the regulations issued by the Secretary of Agriculture under the Agricultural Adjustment Act of 1938, (7 U.S.C.A. § 1281 et seq.,) as charged in Counts 1, 2, 3, 4, 5, 6, 7, 9, 11, 12, 13, 14, 15, 16, 17, and 18 of Indictment No. 7758.

9. The defendant presented such false bills of non-warehouse sale at the Huntington warehouse to H. H. Robertson, a field assistant, as defined in such regulations, who was authorized to act for and on behalf of the United States Department of Agriculture, for entry, and caused them to be entered on defendant's "Dealers Records", designated as form "Tobacco 925" as required to be made and kept by him under Section 725.148 of said regulations, defendant knowing that said bills of non-warehouse sales and the representations thereon were false, as charged in Counts 1, 2, 3, 4, 5, 6, 7, 9, 11, 12, 13, 14, 15, 16, 17 and 18 of Indictment 7758.

10. The evidence shows and defendant admits that the quota marketing cards (non-warehouse sales slips) and "Dealers Records" mentioned in the indictment were false. These sales slips and "Dealers Records" were the records and statements of the defendant pertaining to his tobacco dealings, required by law to be filed by him to determine the amount of penalty due from him. Such statements and records were submitted by the defendant or

by an employee working for the defendant, with full knowledge of the defendant.

11. The defendant was an experienced tobacco dealer, doing business on a large scale, and knew of the various laws and regulations relating to tobacco.

12. The "Dealers Records" report was made up from the forged and altered non-warehouse sales slips mentioned in the various counts of the indictment. Defendant signed each page of this "Dealers Record" knowing it to be false, and thereafter knowingly and wilfully filed and caused it to be filed as a true record of his tobacco dealings for the 1945 crop year, such "Dealers Record" report being required by said Regulation 725.148. Thereafter defendant accepted payment for tobacco sold by him, and paid penalty only upon the basis of such false and fraudulent non-warehouse sales slips and "Dealers Records" report. The exact amount of penalty thereby avoided is not shown by the evidence, but the United States claims that it amounted to about $2,200.00.

13. The evidence shows and the defendant admits that he purchased large amounts (about 8,000 lbs.) of non-quota tobacco from farmers which he did not report or include in his "Dealers Records". Defendant admits that this tobacco was sold at the warehouse. Before it could be sold without penalty it would be necessary to clear it through some fraudulent non-warehouse tobacco cards. Such tobacco was cleared through the warehouse without payment of penalty on quota cards of other farmers, by raising and forging the number of pounds appearing on such quota cards. Much of this non-quota tobacco was not included in the "Dealers Report" of tobacco purchases, to prevent the fraud from being detected. Non-warehouse sales cards were sometimes signed by the farmer in blank so that the dealer could fill in any amount of tobacco he desired before presenting same at the warehouse.

14. While defendant had various persons working for him, he took an active part in all parts of his business, making purchases from farmers and constantly participating in affairs at the warehouse. Defendant personally made many of the purchases from farmers mentioned in various counts of the indictment and had personal knowledge that the amounts of tobacco shown in the "Dealers Reports", signed by him, to have been purchased from these farmers were false.

15. In a matter within the jurisdiction of the United States Department of Agriculture, the defendant knowingly and wilfully made and transmitted and caused to be made and transmitted to the West Virginia State Committee, Production and Marketing Administration, United States Department of Agriculture, "Dealers Records" which he represented to contain a true and complete report of all purchases and resales of tobacco made by him during the 1945-1946 tobacco marketing year, which records and representation were false, as charged in Count 20 of Indictment 7758. Such records failed to show the purchase by defendant during such year from Dewey Adkins, a producer of tobacco, of 1800 pounds of tobacco, subject at the time of marketing to the marketing penalty prescribed by the act, and that defendant then knew such records and representations to be false.