UNITED STATES of America,

v.

Ralph GINZBURG, Documentary Books, Inc., Eros Magazine, Inc. and Liaison News Letter, Inc., Appellants.

Nos. 14742–14745.

United States Court of Appeals Third Circuit.

Argued June 16, 1964.

Decided Nov. 6, 1964.

David I. Shapiro, Washington, D. C. (Sidney Dickstein, Washington, D. C., Norman Oshtry, Philadelphia, Pa., on the brief), for appellants.

J. Shane Creamer, Asst. U. S. Atty., Philadelphia, Pa. (Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Morey M. Myers, Scranton, Pa., Murry Powlen, Philadelphia, Pa., Melvin L. Wulf, New York City, on the brief for American Civil Liberties Union and Its Pennsylvania Affiliate, amici curiae.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellants were convicted of violating the federal obscenity law, 18 U.S.C. § 1461. All three publications involved were found to be obscene under the statute. The record shows that in September, 1962, appellant Eros Magazine, Inc. of which appellant Ginzburg was editor and publisher, after a great deal of deliberation endeavored to obtain what was considered advantageous mailing privileges from Blue Ball, Pennsylvania. Meeting with no success there, a similar try was made with the Post Office at Intercourse, Pennsylvania. Again rejected, a final successful effort was made at the Middlesex, New Jersey Post Office from which over five million advertisements of Eros were mailed. It is not disputed that the bulk of the mailings for the three publications was from Middlesex. In the advertisements above mentioned, inter alia, appeared the following:

"The publication of this magazine—which is frankly and avowedly concerned with erotica—has been enabled by recent court decisions * * to be published."

The magazine Eros was thereafter mailed out from Middlesex. It is with Volume 1, No. 4, 1962 thereof that we are concerned. Eros is a quarterly. Its price is $25. a year.

The second publication was mailed in November, 1962. It was a book which had been originally titled by its author "The Housewife's Handbook for Promiscuity". That book so titled had been sold by mail to a selected list by the author. The title was later changed to read "Housewife's Handbook on Selective Promiscuity". The mailing in this instance was under the latter title. Its price is $4.95.

The third publication is a biweekly newsletter called Liaison. According to the witness Darr who was hired by appellant Ginzburg as editor of Liaison, Ginzburg told him that " * * * Liaison was to cover the same scope [as Eros], in a more newsworthy fashion." Darr was hired after he had specially written and submitted a piece titled "How to Run a Successful Orgy". Ginzburg telephoned him and asked him "When can you start to work?" The particular piece in revised form was published in Liaison. The price of Liaison was $15, later reduced to $4.95.

The advertising material, concededly not obscene of itself, was admittedly mailed by appellants on the specified dates with full knowledge of its contents.

The case was tried to the court, a jury trial having been waived by appellants. The trial consumed five days. Appellants were found guilty on all counts on June 14, 1963. Later, at the request of the appellants, on August 6, 1963, the court filed special detailed findings of fact. Summing up those findings, the court said:

"In conclusion, after a thorough reading and review of all the indicted materials, this Court finds that said materials are compilations of sordid narrations dealing with sex, in each

case in a manner designed to appeal to prurient interests. They are devoid of theme or ideas. Throughout the pages of each can be found constant repetition of patently offensive words used solely to convey debasing portrayals of natural and unnatural sexual experiences. Each in its own way is a blow to sense, not merely sensibility. They are all dirt for dirt's sake and dirt for money's sake."

 We have read, examined and considered the publications involved in this appeal, " * * * in the light of the record made in the trial court, * *." Jacobellis v. Ohio, 378 U.S. 184, 196, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 793 (1964). The only important question before us is whether the publications are obscene under the federal statute. Since this calls for a constitutional judgment it is our duty to decide it. Under the obscenity tests laid down by the Supreme Court, the Constitutional status of the publications " * * * must be determined on the basis of a national standard." Jacobellis, supra, p. 195, 84 S.Ct. p. 1682. This is peculiarly fitting here where over five million advertisements for the Eros material were mailed out to prospects in this country.

Also we have very much in mind that as the Supreme Court stated in Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957):

"All ideas having even the slightest redeeming social importance— unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance."

The Court went on to say, 354 U.S. p. 487, 77 S.Ct. p. 1310, that " * * * sex and obscenity are not synonymous" and ruled on p. 487, 77 S.Ct. p. 1310 that

"Obscene material is material which deals with sex in a manner appealing to prurient interest." It quoted with approval the American Law Institute, Model Penal Code, proposed official draft (May 4, 1962), § 251.41(1):

" ' * * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * * ' "

The same necessary quality named in Roth, supra, and Jacobellis, supra, as affronting current national community standards is described in Manual Enterprises v. Day, 370 U.S. 478, 482, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962) as " 'patent offensiveness' or 'indecency' ". At pages 483, 484, 82 S.Ct. pages 1434–1435, the Day opinion, speaking of the federal obscenity law, notes that " * * * the statute since its inception has always been taken as aimed at obnoxiously debasing portrayals of sex. * * * the statute reaches only indecent material which, as now expressed in Roth v. United States, supra, 354 U.S. at 489, 77 S.Ct. at 1311, 'taken as a whole appeals to prurient interest.' "

This brings us to the special circumstances revealed in the present appeal. We are not dealing with a novel by a well known novelist, written as and for a work of fiction with a firm base of opposition to well defined then existing social conditions, which was held mailable because its " * * * predominant appeal * * * [was] demonstrably not to 'prurient interest'." Grove Press v. Christenberry, 276 F.2d 433, 437 (2 Cir. 1960). Nor have we in this appeal anything comparable to the autobiographical account of the scabrous life of a writer of some pretentions, where numerous revolting episodes were part of a text which the Supreme Court of Massachusetts (184 N.E.2d 328, 334 (1962)) accepted " * * * as a conscious effort to create a work of literary art."

What confronts us is a sui generis operation on the part of experts in the shoddy business of pandering to and exploiting for money one of the great weaknesses of human being. Appellants' fundamental objective obviously was and is to, more or less openly, force their invitations to obscenity upon the American public through the United States mails. They did this in reliance on their own ill conceived theory that all barriers to obscenity have in effect been removed. They were not concerned with trying to circulate authentic artistic efforts that may incidentally have four letter words or nudity or sex as an integral part of a work, whatever art form it may be. Eros was declared as avowedly concerned with one thing, what in the prospectus is described as "erotica" and *which, it is stated, has been enabled to be published "by recent court decisions."* (Emphasis supplied.) An undeniable example of what was meant by erotica is the content of Eros, Vol. 1, No. 4.

Seemingly to soften their approach and to pick up whatever support that might be available, appellants offer separate defenses for each of the publications. For Eros it is claimed in the brief that it "has redeeming social importance with respect to literary and artistic values". Having in mind the above proclaimed objective, even a casual reading makes it readily apparent that bits of nonstatutory material have simply been laced into the obscene structure which is the Eros volume in evidence with the intent of creating that impression. This seems to us not just frivolous but a bold attempt to pioneer both in the elimination of the law itself and in the collection of the resultant profits. We have not seen nor been referred to any decision which countenances that sort of brazen chicanery. If permitted, it would stultify the carefully wrought formula whereby the basic law guarding the national community from obscenity is upheld but not at the expense of honest ideas founded on at least some social importance even if it be but the slightest.

From our own close reading and scrutiny of Eros, its basic material predominantly appeals to prurient interest; it is on its face offensive to present day national community standards, and it has no artistic or social value. The sham device of seeking to somewhat cloak the content with non-offensive items falls of its own evil weight. Cf. Kahm v. United States, 300 F.2d 78 (5 Cir. 1962).

It is asserted that the Handbook has some social-scientific importance. Testimony along that line was expressly disbelieved by the trial judge. Our own reading and examination of this work leads us to the same conclusion. The original title to the book gives its real purpose. That title, "The Housewife's Handbook for Promiscuity" is a fitting capsule description of the content. The mere change in the title, making it sound like some sort of a text book or tract, shows the arrogant insistence of these appellants that raw obscenity is at this time properly an element of national community life. There is nothing of any social importance in the Handbook. It is patently offensive to current national community standards. Applying those standards to the average person its dominant theme as a whole appeals to prurient interest.

Appellants would have it that the book fits into the same category as "Fanny Hill," found not obscene by the New York Court of Appeals in Larkin et al. v. G. P. Putnam's Sons, 14 N.Y.2d 399, 252 N.Y. S.2d 71, 200 N.E.2d 760 (1964). Whatever may eventually be the outcome of that litigation, it has no bearing on this appeal for, inter alia, it was there specifically held as to the book that "It has a slight literary value and it affords some insight into the life and manners of mid-18th Century London."

It is argued that Liaison, the newsletter, is without the statute, on the ground that it does not appeal to prurient interest. As we have seen, according to Ginzburg, the directing head of all three publications, the purpose of Liaison was to cover the same scope as Eros, in a more newsworthy fashion. Our study

of it bears this out. Its material openly offends current national community standards in much the same fashion as does Eros. Taken as a whole, its appeal is directed to the prurient interest of the average person in the national community. The type of thing that it is, as visualized from the test given the successful candidate for its editor, is confirmed by the material printed in it. There is no pretension that it has any social significance or literary merit.

There is defense testimony which would have it that all three publications are not within the reach of the statute. The trier of the facts was not persuaded by it nor are we.

Finding, as we do, that Eros, the Handbook and Liaison are obscene, affirmance of the convictions on the advertising counts follows as of course.

The contentions of appellants that the convictions on the Eros and Liaison counts must be reversed because the trial court failed to find those publications guilty within the statute are without merit. This is clear as to Eros in the Special Findings of Fact, Nos. 16, 17, 18, 19, the concluding paragraph of the Findings above quoted and also, though it is not necessary, in the court's opinion under the caption "Eros Vol. 1, Number 4, 1962." The Liaison Findings, which fully substantiate conviction on those counts, are Numbers 11, 12, 13, 14, 15, the concluding paragraph of the Findings and also, though it is not necessary, the court's opinion under the caption "Liaison Vol. 1, No. 1."

■ There is no substance to the complaint regarding the time of filing of the Special Findings of Fact. Rule of Criminal Procedure 23(c) provides that: "In a case tried without a jury the court shall make a general finding and shall in addition on request find the facts specially."

The trial court's comment in its opinion on this point which is in strict accord with the record, is as follows:

"During the trial the Court made it clear to counsel on more than one occasion that the entry of special findings would be delayed beyond the entry of a general finding if a general finding of guilty was to be entered on any of the counts. There were no objections by defendants' counsel to this proposed procedure. Thus, any objection to the delayed entry of special findings was waived by silence on the record. Likewise after verdict was rendered by the Court, no objections were stated for the record at that time.

"On the merits, this was not an ordinary criminal case where fundamental operative facts had to be determined. Most of the facts are not clear and precise but instead are mixed with questions of law. This is the nature of the case. It is necessary in such a case for the Court to carefully consider all the legal ramifications of the factual setting, which is really largely agreed upon. Such careful consideration requires detailed legal research and assistance of counsel. Consequently, the Trial Court requested proposed findings and such other assistance as counsel could offer. Defendants were not precluded from submitting findings but apparently chose not to do so. We find no merit in this issue raised by them, apparently as an afterthought."

Under the facts the findings were filed promptly and properly within the above rule.

■ It is also asserted that the trial court converted evidence of criminal intent admissible against one defendant into proof of criminal intent on the part of all defendants. This concerns the two unsuccessful attempts to mail out Eros advertising material. The successful mailings from Middlesex were for all three publications. The point is de minimis in any event. The stipulation between counsel for the parties and approved by the court states that the advertising material was mailed by the defendants on the occasions alleged in the indictments with full knowledge of the

contents thereof. We do not find the slightest indication of any substantial confusion on the part of the trial judge with reference to the attempted mailings and mailings of the material involved in the appeal.

■ Appellants object to the admission of the rebuttal testimony of Government witness, Dr. Frignito. This testimony was rightfully presented and received as rebuttal evidence. The witness' complete answer as to the effect of the Handbook makes it evident that he was considering the book's effect on the entire community, not some group thereof. We find no error in this connection.

■ Appellants claim error because at the time of the defense motions for dismissal of the indictment and for acquittal at the end of the Government's case, the trial judge who had read the indictment, as he says in his opinion, had not read at that time " * * * each and every word or sentence of each of the indicted materials * * * " but, as he further said, " * * * the Court read enough of the indicted materials to be able to rule as a matter of law that the Government had made out a prima facie case." There is no prejudicial error in this incident.

■ Finally, appellants urge that the court erred in striking the affidavit and exhibits in support of the defense motion to dismiss the indictment. The defense on that motion was correctly limited by the court to the face of the indictment and whether it accurately charged the named offenses and gave adequate notification thereof to the defendants. The defense attempted by the affidavit and letters to put before the court in ex parte form, opinions from various sources favorable to the Handbook. These were trial matters and so held by the judge.

The district judge was acutely aware of the issue of constitutional law raised in this action. He was conversant with the Supreme Court's views on the federal obscenity statute and was guided accord-

ingly. Our study of the record, including the transcript and convicted materials, establishes that he tried it fairly, carefully and competently. He made no substantial errors of law. We are convinced that, under the evidence, he was justified in finding the defendants guilty on all counts. As we have indicated, we have independently arrived at that same conclusion.

The judgments of the district court will be affirmed.