UNITED STATES of America

v.

Cirilio FIGUEROA.

No. 71 Cr. 1167.

United States District Court, S. D. New York.

Dec. 23, 1971.

Memorandum on Motion to Arrest Judgment Jan. 27, 1972.

Whitney N. Seymour, Jr., U. S. Atty., S. D. N. Y. by Arthur J. Viviani, New York City, of counsel, for plaintiff.

Joseph I. Stone, New York City, for defendant.

## OPINION

EDELSTEIN, Chief Judge.

Cirilio Figueroa was originally indicted in June 1970, together with five codefendants in the Northern District of Illinois, Eastern Division, and charged with the violation of various sections of the narcotics laws. Thereafter, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, the trial of defendants Figueroa and Mr. Francisco Manuel Chacon (presently a fugitive) was transferred to this court. On October 13, 1971, a four count superseding information was filed charging Figueroa as follows:

Count 1: Facilitating the transportation of about 500 grams of heroin on February 19, 1970. (Title 21, U.S.C. Sections 173, 174.)

Count 2: transfer of about 500 grams of heroin on February 19, 1970, not in pursuance of a written order on a form issued by the Secretary of the Treasury. (Title 26, U.S.C. Sections 4705(a) and 7237(b));

Count 3: facilitating the transportation of about 500 grams of heroin on March 25, 1970. (Title 21, U.S.C. Sections 173, 174);

Count 4: transfer of about 500 grams of cocaine on March 25, 1970, not in pursuance of a written order on a form

issued by the Secretary of the Treasury. (Title 26, Sections 4705(a) and 7237 (b)).

Figueroa also was charged with aiding and abetting the commission of the substantive offenses. (Title 18, Sec. 2.)

The case was tried to the court on October 13, 20 and 21, 1971, after the defendant waived a trial by a jury. This court finds the defendant guilty on all four counts as charged. The court in arriving at its decision has carefully considered the testimony of witnesses and exhibits introduced into evidence, the extensive oral argument and proposed findings of fact and conclusions of law.

On February 19, 1970, Agents Dominic P. Petrossi, and Harry M. Fullett, members of the Chicago Regional Office of the Bureau of Narcotics and Dangerous Drugs, acting in an undercover capacity, accompanied Mr. Jose Josende from Chicago to New York to meet the defendant, Cirilio Figueroa. Jose Josende had previously sold heroin and cocaine to Petrossi in Chicago.

These agents secured a room in Queens County, New York, where Fullett remained while Petrossi and Josende continued into New York City to meet Figueroa.

At 163rd Street and Broadway, New York City, Josende entered a bar and placed a telephone call. Josende and Petrossi then left the bar and proceeded to a nearby street corner where they met and conversed with a third individual, Mr. Manuel Chacon. · At approximately 2:30 p. m. Chacon placed a telephone call. Shortly thereafter the defendant, Figueroa, arrived in a motor vehicle. Chacon entered the vehicle which then left the area. It returned shortly thereafter. Then Petrossi and Josende entered the car where Figueroa was introduced to the agent as "Lazaro." (R. 21)[1]

The vehicle, driven by Figueroa, circled the area and then finally parked. During this time Figueroa, Chacon, and Josende conducted a conversation in Spanish which Agent Petrossi could not understand.

Agent Petrossi interrupted the conversation to say that he was there to take care of business and return to Chicago. (R. 24) Figueroa then spoke directly to the agent in English, saying "I know you."

Thereafter Petrossi stated that the narcotics which he had purchased from Josende in Chicago had not been of satisfactory quality and that he, Petrossi, had asked to contact the New York source of Josende's drugs so that the source could guarantee the quality of drugs sold for Chicago distribution. (R. 24–28) Petrossi proposed a plan for future transactions whereby he would pay in advance for one-half of the narcotics purchased until Josende's delivery in Chicago. In Chicago Petrossi's men would determine the quality, after which Petrossi would pay Figueroa in New York. In this way neither Petrossi nor Figueroa would have to touch the narcotics. (R. 25–26)

Thereafter Figueroa, Chacon and Josende conversed again in Spanish, after which Josende inquired about the quantity of narcotics the agent wanted to purchase. Petrossi responded one kilogram of heroin, stating that he only wanted to pay for one-half. Chacon stated that he would obtain the narcotics from Figueroa and transfer them to Josende, who in turn would deliver them at the agent's hotel.

Petrossi asked for a telephone number where Figueroa could be contacted and was told by Figueroa that Josende would give it to him at the time the drugs were delivered, later that day. Petrossi asked whether there was pure cocaine available, and Chacon, after conversing with Figueroa in Spanish, stated that quality cocaine was not available but they expected that a supply would be forthcoming. (R. 13)

Thereafter Figueroa drove back to the area of 163rd Street and Broadway in New York City, where Petrossi exited the vehicle.

1. "(R——)" references apply to pages in the stenographer's minutes.

At approximately 5:45 p. m. that same day Josende delivered 495.7 grams of heroin (54.9%) (Ex. 2), a narcotic drug, (R. 162–165) to the agents in return for $13,500.

On March 25, 1970, Agents Petrossi and Fullett again traveled from Chicago and secured a room in Manhattan, New York. They met with Josende on Broadway at 163rd Street, New York City. The three men then proceeded to a nearby bar where they met with Figueroa. Petrossi, in the presence of Fullett and Josende, conversed with Figueroa in English about Figueroa's health and the poor quality of the heroin previously purchased on February 19 by Petrossi, (R. 37–38), and also Petrossi's continued interest in purchasing heroin and cocaine. (R. 37–39) Petrossi again told Figueroa that he only wanted to pay for one-half of the drugs and asked how much he could buy. Figueroa signaled with his hands and simultaneously stated to Josende "one and one." (R. 39)

The negotiations were interrupted by the arrival at the bar of a woman known to Fugueroa but unknown to the agents. Figueroa told the others in English to meet him at a nearby restaurant. Josende and the agents went by taxi to the restaurant, ordered dinner, and were joined shortly thereafter by Figueroa. (R. 40) Figueroa asked Petrossi, in English, how much money he had. (R. 41) Petrossi replied "$14,000" and stated he wanted to buy one-half kilogram each of cocaine and heroin, on the partial-deferred payment basis previously proposed. Figueroa inscribed figures on a napkin (Ex. 1), referring to the price of the requested narcotics. 13,500 indicated the price of the heroin and 7,000 indicated the price of the cocaine. Figueroa added these figures to arrive at a total price of $20,500, which he inscribed. Petrossi then took the napkin and on it wrote 10,000 with a dollar sign in front of it. Petrossi handed the napkin back to Figueroa who said "O.K." (R. 43) Figueroa then left the restaurant, returning twice, commenting that he was experiencing difficulty locating "his man." He told the agents to wait for him at Josende's apartment. (R. 46)

Petrossi, Josende and Fullett returned to Josende's apartment at 163rd Street and Broadway where they met Chacon and one Emilio Del Gado. Thereafter Fullett and Del Gado left Josende's apartment and went to the agents' motel room. Josende, Chacon and Petrossi remained in the apartment. When Figueroa arrived they entered the bathroom of the apartment where conversations in Spanish and English took place. Figueroa said to Petrossi, in English, that he would deliver the drugs to Chacon, Chacon would deliver the drugs to Josende, and Josende would deliver them to Petrossi. (R. 49) Then Petrossi and Josende went to the motel; thereafter Josende and Del Gado departed, leaving the agents there alone. At about 8:30 p. m. Josende delivered 558.6 grams of heroin (31.89%), and 502.8 grams of cocaine, (21.3%) narcotic drugs (R. 162–165) for which Fullett paid $10,000. (R. 52–53; Ex. 3 and 4)

At no time on either February 19 or March 25, 1970, did anyone, including Figueroa, request of the agents an order form prepared by the Secretary of the Treasury. (R. 54)

Throughout the trial the defense contended that Figueroa could not speak or understand English, or, at the very best his command and understanding of English was minimal. Mr. Figueroa sought to support this contention by his own testimony, through an interpreter. In addition, witnesses called on his behalf testified that in their interactions with Figueroa he always conversed in Spanish.

The government proved that Mr. Rodney J. Walker, Senior Examiner of the Department of Highway Safety and Motor Vehicles, State of Florida, interviewed an individual, on or about December 30, 1969, in connection with the latter's application for the substitution of a Florida chauffeur's license for a standard Florida operator's license. Applicants, who on December 30, 1969, were unable to speak English, were entitled

to be interviewed and assisted by Spanish speaking employees of the Motor Vehicle Department. Such persons were available for that purpose at that time. Mr. Walker does not speak Spanish. He interviewed a Mr. Figueroa who was asked and affirmatively responded that he read, wrote and spoke English.

Mr. Walker did not have an independent recollection of the defendant at the time of trial. He testified that the individual whom he interviewed signed the name "Cirilio Figueroa" to his application in Walker's presence. This application bears the number "K 15771" as well as the signature "Cirilio Figueroa." (Ex. 6A) Defendant presently has issued to him a Florida chauffeur's license bearing the identical identification number, and a signature bearing the name Cirilio Figueroa. (Ex. 5A) This license was issued on December 30, 1969. The defendant admitted on cross-examination that he changed his Florida operator's license to a chauffeur's license at about that time. (R. 211–213)

Agent John O'Neill also interviewed the defendant pursuant to a post-arrest conversation, in English, and was able to obtain information regarding the defendant's pedigree.

■ The government's burden of persuasion with respect to the two violations of Title 21, U.S.C. Secs. 173, 174, required it to prove the following elements:

1. That defendant wilfully and knowingly received or concealed or facilitated the transportation or concealment of a narcotic drug;

2. that the drug had been imported or brought into the United States contrary to law;

3. that defendant knew of the unlawful importation.

■ The elements involved in the conviction of defendant for the two counts

of Title 26, Section 4705(a), U.S.C. are as follows:

1. that defendant sold or bartered or exchanged or gave away a narcotic drug;

2. not in pursuance of a written order on a form issued by the Secretary of the Treasury;

3. that defendant willfully, knowingly, and unlawfully committed said acts.

The government offered no direct proof that the heroin involved in Counts 1 and 3 was illegally imported and that defendant knew this fact. Instead, it chose to rely upon the "permissible inferences" contained in Section 174 of Title 21 U.S.C.[2]

■ Although the utilization of such inferences has been judicially circumscribed recently in cases involving cocaine, the law permits the trier of fact to employ the inference of importation and knowledge thereof when—as here—the substance involved is heroin.

■ The operation of these inferences is permissible. The trier of fact may, if it so chooses, reject this legislatively found "fact" or utilize it in its deliberations. Section 174 does not operate as a substitute for the fact finder's duty to be convinced beyond a reasonable doubt that the ultimate facts are true before it can convict. United States v. Crespo, 422 F.2d 718, 720 (2d Cir. 1970).

■ The operation of the inference is dependent upon the Government's proof beyond a reasonable doubt that the defendant had either actual or constructive possession of heroin.

The government contended that Figueroa had constructive possession of the narcotics sold to Agent Petrossi; the defendant assailed this position.

■■ An individual is said to have constructive possession although he has no contact with a thing if he has both the power and the intention to exercise do-

---

2. "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury." Title 21, § 174.

minion over it, either directly or through another person. United States v. Hernandez, 290 F.2d 86, 90 (2d Cir. 1961); United States v. Jones, 308 F.2d 26, 30 (2d Cir. 1962) (en banc). It is insufficient for the government to establish that the defendant had knowledge of the physical location of the contraband or the defendant's mere presence in the vicinity of it. United States v. Hamilton, 420 F.2d 1096, 1098 (2d Cir. 1970).

■ The government proved that of the three persons involved in the two transactions alleged in counts 1 and 3, Figueroa played the dominant and supervisory role, directing the execution of each drug sale through the employment of his lieutenants Chacon and Josende. It is well established that physical control by an employee or agent whom one dominates, or whose actions one can control, is sufficient to constitute constructive possession. Hernandez, *supra*, 290 F.2d at 90; United States v. Rosario, 327 F.2d 561, 563 (2d Cir. 1964); United States v. Robinson, 354 F.2d 109, 114 (2d Cir. 1965) (en banc); United States v. Hernandez, 441 F.2d 157, 164 (5th Cir. 1971).

Defendant asserts the "possibility" that Josende was the "real seller" and that the latter devised the delivery system with Chacon, without Figueroa's involvement. To the contrary, the evidence demonstrated that Figueroa's presence, participation, and ultimate approval was a condition to the consummation of each narcotic sale.

It is clear that Josende played the menial role of courier and Chacon of intermediary. Josende made the introduction, procured Chacon and delivered the drugs. Chacon himself disclosed his role when he told Petrossi, in the presence of Figueroa, that he would obtain the narcotics from Figueroa, and transfer them to Josende, who would make the ultimate delivery. *See* United States v. Campisi, 248 F.2d 102, 106 (2d Cir.), cert. denied 355 U.S. 892, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957); United States v. Santos, 372 F.2d 177, 180 (2d Cir. 1967).

Lastly, Figueroa urges that his circumstances parallel those of the defendant Hysohion in the recently decided case of United States v. Hysohion, Roupinian and Rimbaud, 448 F.2d 343 (2d Cir. 1971), wherein the Court held that constructive possession was not sufficiently established.

■ The facts herein are distinguishable since Hysohion's ability to assure delivery was negated by (1) his incarceration in prison at the time of the sale, (2) the fact that the actual transfer did not occur as scheduled but occurred two months later, and (3) the "very real" possibility that the delivery system was devised without the supervision of Hysohion. The court in *Hysohion* noted, at 4765, quoting Jones, that a defendant lacks constructive possession if he acts merely as a "casual facilitator" introducing two interested persons bent upon a sale. The case at bar is factually inapposite because the government succeeded in proving that Figueroa was the principal "peddler" and not the "go-between."

■ With respect to counts 2 and 4 which concern violations of the order form requirements, contrary to the defendant's assertion, it was not incumbent upon the government to prove illegal importation or knowledge thereof to support a conviction. United States v. Beverhoudt, 438 F.2d 930, 931 n. 1 (2d Cir. 1971); Yearwood v. United States, 294 F.Supp. 748, 749 (S.D.N.Y.1969).

■ Moreover, since Figueroa was charged as an aider and abettor of a transfer without a proper order form, it was unnecessary for the government to prove that the defendant, himself, physically transferred the narcotics, United States v. Jiminez, 444 F.2d 67 (2d Cir. 1971) nor even that he was present at the time the actual delivery occurred. United States v. Morris, 269 F.2d 100, 102 (2d Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 159, 4 L.Ed.2d 122 (1959); United States v. Joaquin Prada, 451 F.2d 1319 (2d Cir. 1971); United States v. Gray, 271 F.Supp. 649, 650 (E.D.Mo.

1967), aff'd sub nom. Smith v. United States (Gray v. United States), 391 F.2d 605 (8th Cir. 1968). (See, also, United States v. Priest, 419 F.2d 570 (10th Cir. 1970), for a parallel decision regarding conviction for aiding and abetting the transfer of marijuana not pursuant to a written order form.)

Upon the foregoing, which constitutes this court's Findings of Fact and Conclusions of Law,[3] it is determined that the United States has proved beyond a reasonable doubt the essential elements regarding all four counts. The defendant is adjudged guilty on all four counts.

## MEMORANDUM ON MOTION TO ARREST JUDGMENT

Defendant moves, pursuant to Rule 34, Fed.Rules Crim.P. to arrest judgment based upon the contention that "the court lacks jurisdiction to find the defendant guilty" in that:

(1) allegedly contrary to Rule 43, the defendant was not present at the time the verdict was "entered," and

(2) a "general" finding of guilty was filed over sixty days from the close of all evidence, allegedly contrary to Rule 23, Fed.R.Crim.P.

Defendant's contentions shall be considered seriatim.

■ Initially, it should be stated that defendant's use of a Rule 34 motion as a vehicle to challenge various alleged procedural infirmities is both untimely and substantively inappropriate. A Rule 34 motion must be filed within seven days after a determination of guilt. This time constraint is "mandatory and jurisdictional." See 8A Moore ¶ 34.02. Rule 45(b) expressly provides that the court may not enlarge this period for any reason. Moreover, defendant's motion is substantively defective in that the jurisdiction referred to in Rule 34 concerns subject matter jurisdiction rather than the procedural improprieties which are alleged herein.

This fatal defect aside, the court finds, nevertheless, Figueroa's procedural challenges untenable. First, Figueroa contends that Rule 43, Fed.R.Crim. P. commands his presence in open court upon the rendering of a verdict. By a somewhat tortious reference to Rule 34, the defendant insists that judgment must be arrested and the verdict deemed a nullity since the verdict filed on December 27, 1971, was not read to him.

■ Although the language of Rule 43 does not distinguish between jury and non-jury trials, it appears from the context of its language that the mandate requiring a defendant's presence at the time a verdict is rendered is predicated upon enabling the defendant to poll the jury. See 8A Moore, 43.03 n. 13. See also Rule 31(d) Fed.Rules Crim.P. In the context of a non-jury trial, then, it appears that Rule 43 is primarily of ceremonial value.

■ Lastly, the defendant reads Rule 23(c) to forbid the court from entering findings of fact and conclusions of law without his request. To the contrary, the language of Rule 23(c) does not preclude a sua sponte request for proposed findings of fact and conclusions of law. There is ample authority for this approach. See United States v. Belville, 82 F.Supp. 650 (1949); United States v. Ginzburg, 338 F.2d 12, 16 (1964),[1] as well as 8A Moore ¶ 23.05 n. 7. It is noteworthy that as in Ginzburg, counsel for defendant at no time objected to this court's request for proposed findings of fact and conclusions of law.

■ Defendant, it would appear, also assails entry of judgment on the ground that he was denied due process of law because a period of approximately sixty days elapsed from the close of the case to the filing of a general finding of guilt. This time span is claimed to be unreasonable. The defendant's argument is spurious. Although the court was convinced of the defendant's guilt beyond a reasonable doubt shortly after

---

3. The defendant did not request Findings of Fact and Conclusions of Law pursuant to Rule 23(c), Fed.Rules Crim.Proc.

1. This case was cited by the defendant on a related but different point of law.

the close of the case, it withheld pronouncing its verdict because it was thought that findings of fact and conclusions of law might prove to be helpful in the event of an appeal.

The documenting of the factual and legal basis of defendant's guilt seemed clearly to be in the interests of both the government and the defendant. Accordingly the court proceeded as expeditiously as it could to perform this time consuming task.

Nor is the reference to the Second Circuit's rules mandating the prompt disposition of criminal cases pertinent. *See* Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, as amended May 24, 1971.

The court reemphasizes that counsel for defendant was well aware that findings of fact and conclusions of law would be filed in this case. No objection was made. In addition, at no time after the close of trial did defense counsel request the court to announce a verdict. Moreover, the defendant was enlarged on bail during the post-trial period here in issue until the date of sentencing.

The defendant suffered no prejudice as a result of the lapse of time.

The motion is denied in all respects.