**UNITED STATES of America**

v.

**Jose RAMOS, Defendant.**

**No. 85 Cr. 4 (SWK).**

United States District Court,
S.D. New York.

June 20, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by Robert L. Folks, Asst. U.S. Atty., New York City, for plaintiff.

Caesar D. Cirigliano, The Legal Aid Soc., Federal Defender Services Unit by Jack Lipson, New York City, for defendant.

## MEMORANDUM DECISION

KRAM, District Judge.

On May 1, 1985, defendant Jose Ramos was tried by the Court, without a jury, on the charges contained in the indictment in this case. At the close of the prosecution's case, defendant moved, pursuant to Fed.R. Crim.P. 29(a), for judgment of acquittal on Count One of the indictment. The Court reserved decision at that time. Thereafter, without presenting any evidence, defendant rested and renewed his motion for judgment of acquittal. The parties then submitted written summations. Before the Court now, therefore, are defendant's motion for judgment of acquittal on Count One and the Court's findings after the bench trial herein.

### The Indictment

The defendant was named on January 4, 1985, in a two-count indictment alleging violations of the narcotics laws of the United States. Specifically, Count One charges that Ramos conspired with others, unknown and unnamed, to distribute and possess with intent to distribute cocaine. Count Two charges that on or about December 13, 1984, Ramos actually distributed, or aided and abetted the actual distribution of, cocaine.

### The Evidence

The Government presented its case through the testimony of two police officers. The first officer to testify was Police Officer Jose Santiago. Officer Santiago testified that on December 13, 1984, he was assigned to act in an undercover capacity in a "buy and bust" operation. Officer Santiago described a "buy and bust" operation as one in which an officer, in an undercover capacity, attempts to purchase illegal drugs from a street seller and then calls in back-up officers to arrest the seller of the drugs.

Officer Santiago testified that on December 13, 1984, he went with the rest of his "buy and bust" team to the vicinity of 112th Street and St. Nicholas Avenue in Manhattan. He testified that at about 4:00 p.m. he was approached by a young, hispanic male. He described the individual and identified the defendant as that individual.

According to Santiago, Ramos asked him in Spanish if he wanted heroin or cocaine (using the Spanish street names for these drugs). Officer Santiago testified that he asked for cocaine. He testified that he and Ramos then walked together up St. Nicholas Avenue and that Ramos approached an unidentified black male and asked for some "blow," a street name for cocaine. The individual indicated that he had just run out of cocaine and suggested that Ramos and Santiago try the corner of St. Nicholas Avenue and 113th Street.

Santiago testified that he and Ramos then walked to that corner. Ramos then asked an unidentified black male for some "blow." The individual asked Ramos how

much he wanted. Santiago testified that Ramos told this individual that he wanted two dime packages of cocaine.[1] The seller asked Ramos if he had the money. Ramos turned to Santiago and was given twenty dollars of pre-recorded buy money. The seller then told Ramos to tell Santiago to stand aside.

Santiago testified that Ramos and the seller then walked south on St. Nicholas Avenue toward 112th Street. Santiago followed them at a distance of approximately ten to fifteen feet. He testified that he observed Ramos slip the twenty dollars into the seller's hand. Santiago testified that the seller left at the corner of 112th Street and walked east toward Lenox Avenue. Ramos turned and walked back to Santiago. Santiago testified that he and Ramos crossed St. Nicholas Avenue and that Ramos then handed him one foil packet. Ramos explained that the seller had gone to get the other packet.

A few moments later, the seller returned. Santiago testified that he and Ramos crossed St. Nicholas Avenue toward him. As they approached, the seller placed one packet on a car and directed Ramos to it. Santiago testified that the seller continued walking north on St. Nicholas Avenue.

Santiago testified that Ramos retrieved the packet from the car and handed it to him. Santiago thanked Ramos and asked him if he could find him again if he wished to make other purchases. Ramos indicated that he was usually in the neighborhood. Santiago testified that they then parted company and that Ramos walked south on St. Nicholas Avenue. Santiago returned to his car a few blocks away and radioed the descriptions of Ramos and the seller to his back-up teams.

Santiago learned over the radio that Ramos had been apprehended, and then drove around for approximately forty-five minutes looking, without success, for the other individual. Santiago testified that he saw Ramos at the station house at approximately 5:20 p.m. and identified him as the person involved in Santiago's purchase of cocaine.

Santiago indicated in his testimony that he was in Ramos' presence, or was observing Ramos, for approximately ten minutes. He further testified that Ramos asked him on at least three occasions during that ten-minute span whether he was a cop.

Santiago identified an evidence pouch (Government's Exhibit 1) as the one he had sealed on December 13, 1984, containing the two foil packets received from Ramos. The parties stipulated that, if called to testify, the chemist who did a field test on the substances contained in those packets would testify that the results of the test were positive indicating that the substances were cocaine.

Police Officer Vincent Coogan was the second person to testify for the Government. He testified that on December 13, 1984, he was a member of one of the two back-up teams in Officer Santiago's "buy and bust" operation. He further testified that he witnessed the arrest of Jose Ramos and identified Ramos in court as the individual arrested on that day.

Officer Coogan also testified that he was present at approximately 8:50 p.m. when the defendant was interviewed at the 26th Precinct by Assistant United States Attorney Robert Folks. Officer Coogan identified a document containing printed questions and written responses (Government's Exhibit 2) as the form memorializing that interview. That form indicates that Ramos responded to the question "Would you like to tell me what happened?" with the following statement:

> [undercover] came and asked if I had any coke. I said no but I pointed out the dude who did. I suppose [sic] to get $1 but I didn't get that. I was supposed to get $1 if the bag gets sold but I didn't get a chance to collect. They got me.

---

1. The testimony was unclear as to when and how Ramos learned how much cocaine Santiago wanted to purchase. Santiago apparently told Ramos that he wanted two dime packages, or twenty dollars worth of cocaine, either during their initial conversation or in response to this seller's inquiry.

They were lookin[g] for him but they missed him.

No further evidence was introduced by the Government. The defendant, as indicated above, rested without introducing any evidence.

### Defendant's Motion for Judgment of Acquittal

At the close of the Government's case, defendant moved, pursuant to Fed.R. Crim.P. 29, for judgment of acquittal on Count One, the conspiracy count. Relying on *United States v. Tyler*, 758 F.2d 66 (2d Cir.1985), defendant argued that the Government adduced insufficient evidence of an agreement between himself and the unidentified seller to establish the existence of a conspiracy to distribute cocaine. That motion was renewed when the defendant rested without presenting any evidence in his defense. The motion is currently before this Court.

Rule 29 of the Federal Rules of Criminal Procedure provides, in relevant part, that "[t]he court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment . . . after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

■ On a motion for judgment of acquittal, the district judge must determine whether the evidence is substantial enough for a reasonable fact-finder to find guilt beyond a reasonable doubt. *See United States v. Taylor*, 464 F.2d 240 (2d Cir. 1972); *United States v. Brown*, 462 F.Supp. 184, 187 (S.D.N.Y.1978), *rev'd on other grounds*, 602 F.2d 1073 (2d Cir.), *cert. denied*, 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979). As Judge Friendly set out in *Taylor*,

[t]he true rule, therefore, is that a trial judge, in passing upon a motion for a directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the . . . [fact-finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind *might* fairly conclude guilt beyond a reasonable doubt.

464 F.2d at 243 (*quoting Curley v. United States*, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947)) (emphasis added).

■ As the standard requires, I do not test the evidence in a Rule 29 motion based on how I will resolve the matters in dispute, but rather on how a reasonable fact-finder might resolve the issues in dispute. In doing so, I must view the evidence in the light most favorable to the prosecution and resolve all doubts in the prosecution's favor. *See United States v. Artuso*, 618 F.2d 192, 195 (2d Cir.1980).

Although the Court did not find the Government's case to be a strong one, viewed under the appropriate standard, defendant's motion must be denied. Relying on *Tyler*, defendant argues that there is insufficient evidence to establish the existence of an agreement. Defendant's reliance on *Tyler* is to no avail.

In *Tyler*, the defendant had offered to help an undercover officer purchase heroin. He had made "some type of inquiry" of one unidentified individual (at 68), and then encountered a seller of heroin. After the defendant had a brief conversation with the seller, the seller approached the undercover officer and they consummated the deal without any further involvement of the defendant. The defendant then walked up to the undercover officer and asked for some change. Based on this evidence, Tyler was convicted of a conspiracy to distribute heroin.

The Second Circuit reversed Tyler's conviction on the conspiracy count because the evidence adduced at trial was insufficient to establish the existence of an agreement. The Second Circuit noted several facts that were "conspicuously absent" which might have supported a finding that an agreement existed. At 68. Those were as follows: (1) the defendant had not ascertained from the undercover officer the quantity of heroin desired; (2) there had been no indi-

cation that the defendant had a specific source in mind; (3) there was no evidence that the defendant knew where to find the ultimate seller or expected him to be in the area; and (4) there was no evidence that the defendant had any pre-existing relationship with the seller, or that he had made any previous deals with him.

■ In the instant case, there is evidence that Ramos asked Santiago how much cocaine he desired. Officer Santiago testified, at least at one point, that Ramos asked him during their initial conversation how much he wanted.

Moreover, there is evidence which might indicate that Ramos had a specific source or sources in mind. Officer Santiago testified that the first individual Ramos approached indicated that he had just run out of cocaine.[2] That individual suggested going to the corner of 113th Street, but did not identify a source. Ramos, nonetheless, approached the seller without further assistance and secured the cocaine. A reasonable fact-finder could infer from the fact that Ramos went directly to two sources of cocaine that he had his sources in mind to begin with.

Finally, and most significantly, there was evidence tending to suggest that Ramos had a pre-existing relationship with the seller. Unlike in *Tyler*, the seller dealt exclusively with Ramos, and not with the undercover purchaser, even though he apparently knew who the actual purchaser was. Moreover, during AUSA Folks's pre-presentment interview of Ramos, Ramos indicated that he "was supposed to get $1 if the bags gets sold but [he] didn't get a chance to collect." A reasonable fact-finder could infer from that statement that Ramos had an agreement with the seller whereby he received one dollar for each sale he procured. Unlike Tyler, Ramos made no effort to get any money from Santiago. He did, however, have the opportunity to do so. It would appear, there-

fore, that Ramos' anticipated reward was to come from the seller.

In sum, the Court finds that there was sufficient evidence from which a reasonable fact-finder could find Ramos guilty beyond a reasonable doubt. Accordingly, his Rule 29 motion is, perforce, denied. Having said this, however, it remains to be seen whether this reasonable fact-finder is convinced beyond a reasonable doubt.

### Judgment on the Merits

The defendant did not request special findings of fact pursuant to Fed.R.Crim.P. 23(c). Nevertheless, the Court feels that more detailed findings are appropriate in this case. *See United States v. Figueroa*, 337 F.Supp. 645, 652 (S.D.N.Y.1972) (approving *sua sponte* decision to find facts specially); *see also Sullivan v. United States*, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954). In reviewing the evidence and determining my findings, I have read the parties' written summations and treated them as proposed findings of fact and conclusions of law.

### *Count One*

■ One of the essential elements of the crime of conspiracy charged in this count is an agreement or understanding to violate the law. *See United States v. Barnes*, 604 F.2d 121, 154 (2d Cir.1979) ("The gist of the offense of conspiracy is agreement."). The evidence which would support a finding that such an agreement existed is discussed above. Drawing all inferences in favor of the prosecution might lead one to find the existence of an agreement. Nonetheless, I am not convinced beyond a reasonable doubt that such an agreement existed. Officer Santiago's description of the events that transpired on December 13th suggest that Ramos may have been simply a scavenger—seeking out willing purchasers and, then, willing sellers in the hope of gaining some financial reward. It is entirely possible that no agreement existed between Ramos and the seller at any time.

---

**2.** In *Tyler*, the evidence did not even establish that the conversation with the first unidentified individual involved the sale of narcotics.

Great reliance is placed on Ramos' statement to AUSA Folks in support of the inference that such an agreement existed. It is possible, however, that Ramos' statement is a total fabrication. Ramos' statement is not consistent with Santiago's testimony insofar as he indicates that he merely "pointed out the dude" who had cocaine for sale. Thus, it would appear that Ramos may have been trying to minimize his involvement in the transaction. It is possible that Ramos made up that part of the statement which discussed a one dollar gain in furtherance of those efforts to minimize his involvement.

Moreover, even assuming the truth of Ramos' statement regarding his anticipated gain, it is possible that Ramos received an *ad hoc* promise of one dollar from the seller for this single transaction. Ramos and the seller were out of Santiago's earshot when the money and the first packet of cocaine changed hands. It is possible that the seller promised Ramos a one dollar reward at this point. An "agreement," if such a promised reward can be called that, formulated at this late point in the transaction would not satisfy me that a conspiracy existed.

In sum, several equally plausible scenarios are suggested by the evidence against Ramos. Only one of those scenarios involves an agreement sufficient to support a conviction on the conspiracy count. The Government has not proven to me beyond a reasonable doubt that such an agreement existed. Accordingly, the defendant is hereby adjudged not guilty on Count One.

*Count Two*

■ The evidence was much stronger as to Count Two. Officer Santiago testified that he was with, or was observing, the individual procurer for approximately ten minutes. His identification of Ramos as that individual convinces me beyond a rea-

sonable doubt that Ramos was the person involved in the transaction on December 13th.

Moreover, the testimony of Officer Santiago established beyond a reasonable doubt that on December 13, 1984, Ramos came into the possession of two packages of a substance purported to be cocaine from an unidentified seller and that he distributed those packages to Santiago.

Santiago's testimony further established that Ramos volunteered to procure cocaine for him, and, therefore, that his conduct was voluntary and deliberate. Moreover, Santiago's testimony regarding Ramos' concern about whether Santiago was a police officer demonstrated beyond a reasonable doubt that Ramos was aware of the general, unlawful nature of his acts.

The evidence also established beyond a reasonable doubt that the substance distributed contained cocaine. Finally, the evidence showed that the conduct involved took place on or near St. Nicholas Avenue in the borough of Manhattan, which is within the Southern District of New York.

In sum, the Government proved beyond a reasonable doubt all of the elements of the crime of distributing a Schedule II narcotic drug controlled substance.[3] Accordingly, Ramos is hereby adjudged guilty on Count Two.

As set out above, Ramos' motion for judgment of acquittal, pursuant to Fed.R. Crim.P. 29, is DENIED; Ramos is adjudged NOT GUILTY on Count One of the indictment; and Ramos is adjudged GUILTY on Count Two of the indictment.

SO ORDERED.

---

3. Even if I were not convinced beyond a reasonable doubt that Ramos actually distributed the narcotic substances, the Government proved beyond a reasonable doubt that he aided and abetted the actual distribution of those substances. There is no doubt whatsoever from the evidence adduced at trial that Ramos "associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *See United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir.1975), *quoted in Tyler,* at 70.